Glenn Edward CARRUTH, Appellant,

v.

The FIRST NATIONAL BANK OF FORT
WORTH et al., Appellees.

No. 4893.

Court of Civil Appeals of Texas,
Eastland.

Original Opinion Nov. 24, 1976.

Supplemental Opinion Dec. 9, 1976.

Rehearing Denied Dec. 16, 1976.

Charles B. McGregor, Beard & Kultgen, Waco, for appellant.

Jack C. Wessler, Jerry L. Hughes, Fort Worth, Lee M. Simpson, Dallas, for appellees.

McCLOUD, Chief Justice.

This is a civil conspiracy case involving a wrongful foreclosure. The controversy concerns three tracts of land that will be designated as front, middle, and back tracts. Plaintiff, Glenn Edward Carruth, sued defendant, The First National Bank of Fort Worth, alleging the bank participated in a conspiracy to deprive plaintiff of the front and back tracts. Plaintiff joined defendants, Tarleton Arms Apartments, Ltd., and Federal National Mortgage Association, seeking foreclosure of an implied vendor's lien on the middle tract. The jury found in Special Issue 1 there was a conspiracy between the bank and B. B. Adams, Jr., to deprive plaintiff of the two tracts, and in Special Issue 2, the market value of the two tracts at the time of foreclosure was $210,000. The trial court granted bank's motion to disregard the conspiracy finding in Special Issue 1, and entered judgment notwithstanding the verdict, that Carruth take nothing against the bank. Federal National Mortgage Association was granted an instructed verdict. Default judgment was entered against Tarleton Arms Apartments, Ltd., awarding plaintiff an implied vendor's lien on the middle tract. The trial court held, however, the vendor's lien was inferior and subsequent to the lien of Federal National Mortgage Association. Plaintiff, Glenn Edward Carruth, appeals. We reverse and render in part and affirm in part.

The jury's answer to Special Issue 1 may not be disregarded if there is any probative evidence which, with proper inferences, will reasonably support the finding. Rule 301, T.R.C.P.; *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *Morsch v. Metzger,* 520 S.W.2d 564 (Tex.Civ.App.—Corpus Christi 1975, writ ref. n. r. e.).

In determining if there is any evidence to support the jury's finding, we must review the evidence in its most favorable light, considering only the evidence and inferences supporting the finding and rejecting the evidence and inferences contrary to the finding. *Martinez v. Delta Brands, Inc.,* 515 S.W.2d 263 (Tex.1974).

Plaintiff wanted to build an apartment project in Stephenville, Texas. He acquired an option to buy 17.475 acres of land, which was later divided into three tracts. The front tract contained 6.651 acres, the middle tract 6.659 acres, and the back tract 4.165 acres. Carruth planned to build the apartment project on the middle tract. He employed M. O. Killion to help him "package" the deal. Killion knew how to get the necessary "financing and contractors". Killion took plaintiff to B. B. Adams, Jr., in Fort Worth who would built the apartments. Adams was to get the financing for plaintiff through FHA in Fort Worth. The original plan was that Carruth would own the apartments, and Adams would profit as builder. Adams went with Carruth to The First National Bank of Forth Worth. The bank on February 24, 1971, loaned Carruth $70,000 to purchase the land. On that same date, the 17.475 acres were conveyed to plaintiff and an expressed vendor's lien was retained in the deed in favor of the bank. Also, on such date, Carruth executed a deed of trust in favor of the bank to secure the $70,000 note. Adams signed a guaranty agreement with the bank, dated February 25, 1971, guaranteeing Carruth's $70,000 obligation. The apartment project did not involve either the front or back tracts. Carruth planned to develop the front tract for commercial purposes, and build townhouses on the back tract.

Carruth gave Adams $5,000 which he understood was to be used to get the commitment from FHA. He learned a problem existed with the commitment and he would not be able to close the transaction in his name with FHA. He attempted to sell, but was unsuccessful. Carruth then executed a deed dated June 9, 1971, conveying the middle tract to B. B. Adams, General Contractor, Inc. He testified he did this because he was under the impression the commitment was running out and he would lose the financing. B. B. Adams, Jr., was the president of B. B. Adams, General Contractor, Inc. The consideration stated in the deed was the assumption by grantee of Carruth's $70,000 obligation to the bank. The deed referred to the deed of trust in favor of the bank securing the $70,000 note. Carruth testified that also as part of the consideration for the conveyance, B. B. Adams, Jr., agreed to pay a $20,000 fee owed by Carruth to M. O. Killion.

By deed dated June 9, 1971, B. B. Adams, General Contractor, Inc., conveyed the middle tract to Tarleton Arms Apartments, Ltd. The deed recited a cash consideration. B. B. Adams, Jr., signed the deed as president of the corporation. B. B. Adams, Jr., paid the bank $30,000 which was credited on the $70,000 note. The bank executed a partial release dated June 9, 1971, releasing its lien on the middle tract. Tarleton Arms executed its deed of trust note dated June 9, 1971, in the amount of $1,530,800 payable to the bank. The note was secured by a deed of trust lien in favor of the bank dated June 9, 1971, on the middle tract. The purpose of the loan represented by this note was to provide interim financing for the construction of apartments on the middle tract. On December 6, 1972, the bank assigned for a valuable consideration the $1,530,800 note and deed of trust lien to Federal National Mortgage Association. On November 24, 1971, prior to the above mentioned assignment, Carruth and the bank executed an extension agreement extending the due date of the $40,000 balance owed the bank on the original $70,000 note. The note was not paid by B. B. Adams, General Contractor, Inc., and Carruth testi-

fied he could not pay the note. The note became delinquent and the bank on June 5, 1973, foreclosed on the back and front tracts. The bank bid the property in for $46,388.89, the amount of the unpaid balance owed on Carruth's note. The bank then sold the two tracts to B. B. Adams, Jr., the bank's guarantor for both Carruth and B. B. Adams, General Contractor, Inc., by deed dated September 4, 1973. The consideration was Adams' $46,500 promissory note to the bank.

If B. B. Adams, General Contractor, Inc., had paid the $70,000 note it assumed, plaintiff, Carruth, would have owned the front and back tracts free and clear. Carruth contends that by delaying payment of the note until after foreclosure, B. B. Adams, Jr., deprived Carruth of the front and back tracts and got the two tracts for himself at a cost exactly equal to what he was previously obligated to pay for the middle tract alone.

■ An actionable civil conspiracy has been defined as a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Great National Life Insurance Co. v. Chapa,* 377 S.W.2d 632 (Tex.1964).

We must determine if there is any evidence of a conspiracy between the bank and B. B. Adams, Jr., to deprive Carruth of the two tracts of land.

B. B. Adams, Jr., was the president of B. B. Adams, General Contractor, Inc., Carruth's assumptor and grantee. The bank had the personal guarantee of B. B. Adams, Jr., to cover all loans made to B. B. Adams, General Contractor, Inc., and other Adams "companies". A bank officer testified Adams was a long time customer. Adams and his companies had 15 different accounts with the bank. These were listed as "related" on the credit data sheet prepared by the bank in connection with the loan to Carruth. The average balance in these related checking accounts was shown to be $78,000. At the time of the loan, Adams and related companies were listed as having $161,000

cash. B. B. Adams, General Contractor, Inc., was shown as owning stocks and bonds of $100,000. The bank received a $30,000 servicing fee in connection with the interim financing of the apartment project on the middle tract. It had had a number of similar transactions with Adams in the past. The $70,000 note executed by Carruth was his only transaction with the bank.

Jones, a bank officer, testified that he had an understanding with Adams that he would foreclose; that he was not sure how the understanding evolved—whether it was a result of a request from Adams; that the decision was a "common decision" with Adams; that he had an understanding with Adams that Adams' lawyer, Courtade, would be appointed substitute trustee; that he discussed the amount to be bid at the foreclosure sale with Adams in advance of the sale; that he discussed how the credit was to be applied on the note; and, that he assumed "we discussed all of the particulars of it". He further testified that prior to the foreclosure sale, the bank had an understanding with Adams that he would buy the property from the bank after the foreclosure and the bank would lend him the money to buy and take his note for the purchase price.

Adams' attorney, Courtade, who conducted the sale testified that the assumption was discussed numerous times with the bank. He stated that Adams' position about the note was that if he paid it, he wanted the property. Adams knew that if the Carruth note was properly credited at the time the bank bid in the balance owed it on the note, there would have been no remaining balance and Adams would be no longer liable as a guarantor. Courtade testified that during all of the negotiations which led up to the foreclosure, Adams knew he was going to wind up buying the property from the bank. He stated that the assumption was a "key issue" and it was discussed with the bank's officer, Reid.

Courtade, as substitute trustee, executed his deed to the bank, conveying the front and back tracts, on June 5, 1973. The bank conveyed the property to B. B. Adams, Jr.,

on September 4, 1973. The bank's records do not show the Carruth note paid until after the sale to Adams.

Concerning the type of evidence which will support a finding of conspiracy, the court in *International Bankers Life Insurance Company v. Holloway*, 368 S.W.2d 567 (Tex.1963) said:

"It was early said by this Court in *Jernigan v. Wainer*, 12 Tex. 189:

'When men enter into conspiracies, they are not likely to call in a witness * * * In such cases the injured party must necessarily have recourse to circumstantial evidence. For it is only by the inferences and deductions which men properly and naturally draw from the acts of others in such cases, that their intentions can be ascertained. They are not likely to proclaim them in the hearing of witnesses.'

And in *Whitmore v. Allen*, 33 Tex. 355, that

'A conspiracy may be proven as well by the acts of the conspirators, as by anything they may say, touching what they intended to do.'

The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of common design, intention or purpose of the alleged conspirators . . ."

A limitation on the effective use of circumstantial evidence to establish a conspiracy was observed in *Echols v. Austron, Inc.*, 529 S.W.2d 840 (Tex.Civ.App.—Austin 1975, writ ref. n. r. e.), wherein the court said:

"Although circumstantial evidence may be sufficient to prove the existence of a conspiracy, disconnected circumstances any one of which, or all of which, are just as consistent with a lawful purpose as with an unlawful undertaking are insufficient to establish a conspiracy. *Switzer v. Joseph*, 442 S.W.2d 845 (Tex.Civ.App. 1969, no writ), *Gager v. Reeves*, 235 S.W.2d 688 (Tex.Civ.App.1950, writ ref'd

n. r. e.), 15A C.J.S. Conspiracy § 30, at 699–700 (1967)."

■ Where the purpose to be accomplished is lawful and no unlawful means are used, there can be no civil conspiracy. *Texas State Board of Examiners in Optometry v. Carp,* 388 S.W.2d 409 (Tex.1965); *Kingsbery v. Phillips Petroleum Company,* 315 S.W.2d 561 (Tex.Civ.App.—Austin 1958, writ ref. n. r. e.); *Davis v. Alwac International, Inc.,* 369 S.W.2d 797 (Tex.Civ.App.—Beaumont 1963, writ ref. n. r. e.); *Bartlet v. Lehmann,* 207 S.W.2d 131 (Tex.Civ.App.—Austin 1947, writ ref'd); *Meurer v. Hooper,* 271 S.W. 172 (Tex.Civ.App.—Fort Worth 1925, writ ref'd); *DesLauries v. Shea,* 300 Mass. 30, 13 N.E.2d 932 (Mass.Sup.1938); *Ashley v. Lance,* 80 Wash.2d 274, 493 P.2d 1242; 15A C.J.S. Conspiracy § 3.

The First National Bank of Fort Worth argues, regardless of the motives of B. B. Adams, Jr., or B. B. Adams, General Contractor, Inc., it had a legal right to foreclose and sell the property to its guarantor, and, therefore, has committed no unlawful act. We disagree.

The jury found in Special Issue 3 that the market value of the middle tract was $100,000 at the time that the bank executed the release of the tract. The jury found that the value of the land released by the mortgagee bank exceeded the amount owed the bank by the mortgagor, Carruth. We think the proper rule was recognized in *Santoro v. Kleinberger,* 115 Conn. 631, 163 A. 107 (1932) wherein the court said:

"... As between a mortgagor and one to whom he transfers the equity of redemption and who assumes and agrees to pay the mortgage, by the assumption agreement the latter becomes the principal and the former the surety with a right of recourse against his principal if he is compelled to pay the debt. *Trotta v. Prete,* supra, page 445 of 112 Conn. [442], 152 A. 585. The mortgagor has the right to have the mortgaged property applied to the payment of the mortgage debt so far as necessary for his protection against his personal liability for the debt secured. If, therefore, the mortgagee releases the mortgage or a portion of the mortgaged premises to a purchaser who has assumed the mortgage, the mortgagor is relieved of liability to the extent of the value of the security of which he has thus been deprived. *Townsend Sav. Bank v. Munson,* 47 Conn. 390; *Goodwin v. Jackson,* 97 Conn. 358, 116 A. 617; *First Nat. Bank & Trust Co. v. Strong,* 112 Conn. 412, 152 A. 575; 2 Jones on Mortgages (8th Ed.) § 839 . . ."

The rule was approved in *Greater Adelphia Building & Loan Ass'n v. Trilling,* 323 Pa. 361, 185 A. 716 (1936) as follows:

"... As respects the collateral securing the mortgage debt, the mortgagor and his grantee occupy, respectively, the positions of surety and principal. The mortgagor is entitled at all times to have the security applied on the debt. As respects the real security, the land, the mortgagee may not release it or any portion of it from the lien of the mortgage, or otherwise deal with it as between itself and the mortgagor's grantee so as to destroy or impair its value as security for the debt, thus tending to enlarge the mortgagor's personal liability on his bond or original undertaking. *Meigs v. Tunnicliffe,* 214 Pa. 495, 63 A. 1019, 112 Am.St. Rep. 769, 6 Ann.Cas. 549; *Hunter's Assigned Estate,* 257 Pa. 32, 101 A. 79. The reason for this, as Judge Keller stated in *Zusin v. Wharton Business Men's B. & L. Ass'n,* 107 Pa.Super. 181, 188, 163 A. 377, 380, is that the mortgagor, or one in succession to his rights (as are defendants in the case at bar), 'would have the right to pay the original debt or obligation to the [mortgagee] and require the assignment to her or him, respectively, of the securities held by the [mortgagee] for its payment.' . . ."

See also: *Burson v. Blackley,* 67 Tex. 5, 2 S.W. 668 (1886) and 112 A.L.R., page 1343.

In *Dansby v. Stroud,* 48 S.W.2d 1018 (Tex.Civ.App.—Waco 1932, writ ref.), the court said:

"... where a party who is liable for the payment of a vendor's lien note conveys the land to a subsequent vendee who

assumes the payment of the notes, as between him and his vendee, his vendee becomes primarily liable, and he becomes a surety, but as between them and the holder of the notes they are both primarily obligors. *Middleton v. Nibling* (Tex. Civ.App.) 142 S.W. 968, par. 3. If the holder of the notes accepts the promise of the subsequent purchaser to pay the notes, such subsequent purchaser becomes primarily liable and his vendor becomes surety . . ."

■ We hold the mortgagee bank could not lawfully release the middle tract from the lien without the knowledge or consent of Carruth.

The trial court found in its judgment notwithstanding the verdict that by executing the extension agreement dated November 24, 1971, Carruth waived as a matter of law any right to complain of the release by the bank of the middle tract from the lien. The court concluded that the evidence conclusively established that at the time Carruth executed the extension agreement he had knowledge of the partial release. We disagree.

Carruth in his deposition and on cross-examination gave answers to the effect that he knew about the release of the middle tract in June of 1971. But in other parts of his testimony, he states he did not know about the release until 1973; that he did not know about it on June 9, 1971; that he did not know about it in November, 1972, when he signed the extension agreement; that he is no lawyer and when he talks about "releases" to him it might mean two or three things; that in testifying about a release in his deposition, he was talking about his knowledge the bank "had given them an okay to go ahead and start with the construction of the apartments".

■ Before the testimonial declaration of a party will be given conclusive effect, it must appear among other things that the statement is deliberate, clear, and unequivocal. *Dallas Railway & Terminal Company v. Gossett,* 156 Tex. 252, 294 S.W.2d 377 (1956). If the statement merely contradicts some other portion of the party's testimony,

conclusive effect cannot be given thereto, but a fact issue is presented for the determination of the jury as in the case of an ordinary witness. *United States Fidelity & Guaranty Co. v. Carr,* 242 S.W.2d 224 (Tex. Civ.App.—San Antonio 1951, writ ref.).

The extension agreement signed by the bank and Carruth states that the deed of trust securing the $70,000 note covers "three tracts of land"; that the payment date of the note is extended; and that in every other respect the terms of the note and "Deed of Trust" shall remain in force unchanged.

■ Carruth's testimony regarding his knowledge of the release of the middle tract at the time he signed the extension agreement is contradictory. The court erred in holding as a matter of law Carruth waived any rights to complain. The bank failed to request issues on waiver, consent, or knowledge. Such independent grounds of defense were waived. Rule 279, T.R. C.P.; *Glens Falls Insurance Co. v. Peters,* 386 S.W.2d 529 (Tex.1965).

The release by the bank of the middle tract was not shown to be authorized. The value of the tract when released was established by the jury as greater than the obligation owed by Carruth to the bank. The bank's unauthorized act released the front and back tracts from the bank's lien. The bank's subsequent foreclosure, therefore, on the front and back tracts was unlawful. The bank's argument that it had a legal right to do what it did fails.

■ We think the jury could reasonably infer from the evidence that B. B. Adams, General Contractor, Inc., refused to pay the note it had assumed, because B. B. Adams, Jr., wanted the front and back tracts for himself, and the bank proceeded to help him accomplish this purpose. The jury could infer that the bank agreed to foreclose, which we have held it had no legal right to do, and sell to Adams, thereby eliminating Carruth, despite the assumption of Carruth's note by B. B. Adams, General Contractor, Inc., in order to accommodate a valued customer from whose business it had

made large profits. We hold, therefore, the court erred in disregarding Special Issue 1, because there was some probative evidence to support the jury's answer that a conspiracy existed between B. B. Adams, Jr., and the bank to deprive plaintiff of the two tracts of land.

We also hold that under the facts of this case the legal fiction of the corporate entity, B. B. Adams, General Contractor, Inc., will be disregarded since it should not be relied upon to justify a wrong. *First Nat. Bank in Canyon v. Gamble,* 134 Tex. 112, 132 S.W.2d 100 (1939); *McDonald & Company v. Kemper,* 386 S.W.2d 215 (Tex. Civ.App.—Fort Worth 1965, no writ); *Sapphire Homes, Inc. v. Gilbert,* 426 S.W.2d 278 (Tex.Civ.App.—Dallas 1968, writ ref. n. r. e.).

We next consider Carruth's contention the trial court erred in granting defendant, Federal National Mortgage Association, an instructed verdict. Plaintiff concedes in his brief that if the release of the middle tract released the other two tracts, then the court did not err in granting the instructed verdict. We have held that the front and back tracts were released from the lien because of the bank's release of the middle tract.

The jury found that the market value of the front and back tracts at the time of the foreclosure was $210,000. Plaintiff alleged actual damages of $200,000. The take nothing judgment rendered by the trial court in favor of the bank is reversed and judgment is rendered in favor of plaintiff, Glenn Edward Carruth, against the defendant, The First National Bank of Fort Worth, for $200,000. In all other respects, the judgment of the trial court is affirmed.

Reversed and rendered in part and affirmed in part.

## SUPPLEMENTAL OPINION

We note that we failed to specifically state in our main opinion that interest on the $200,000 judgment rendered in favor of Glenn Edward Carruth against The First National Bank of Fort Worth shall accrue at the rate of 9% per annum from November 20, 1975, the date of entry of the erroneous portion of the trial court's judgment.

We hereby amend our main opinion and judgment dated November 24, 1976, to expressly provide that interest on the $200,000 judgment in favor of Glenn Edward Carruth against The First National Bank of Fort Worth shall accrue at the rate of 9% per annum from November 20, 1975. *American Paper Stock Company v. L. M. Howard,* 528 S.W.2d 576 (Tex.1975); Art. 5069–1.05, Tex.Rev.Civ.Stat.Ann.