GARWOOD, Circuit Judge:
In this suit plaintiffs, Brazos Enterprises, Inc., and Theodore Mack, Trustee in Bankruptcy of Dairyland, Inc., sought recovery against defendants, Equico Lessors, Inc., Wade Newton, and Bill Mesker, on the basis of civil conspiracy, conversion, fraudulent conveyances, and usury. Following a jury trial, the trial court rendered judgment for actual and exemplary damages against defendants, but denied any recovery for usury. Defendants appeal, and the Trustee cross-appeals the denial of its usury claim. We affirm the denial of the usury claim and reverse in part and affirm in part as to the remainder of the case, remanding for the entry of judgment consistent with our holdings.
I.
CONTEXT FACTS
General Nature of Suit
This complex case primarily concerns the financing of the dairy cattle operations of the now bankrupt corporation, Dairyland, Inc. (“Dairyland”) and of its acquisition of the Bosque County ranch on which such operations were conducted. Defendant Equico Lessors, Inc. (“Equico”) provided part of the financing both for Dairyland’s operations and for its acquisition of the ranch from plaintiff Brazos Enterprises, Inc. (“Brazos”), a corporation wholly owned and controlled by G.J. Roberts (“Roberts”). Defendants Wade Newton (“Newton”) and Bill Mesker (“Mesker”) were principals in Dairyland, and were also owners of a separate business, a partnership known as Dairy Cows. Equico likewise provided financing to Dairy Cows, and Dairy Cows was also partially financed by Misco Leasing (“Misco”), an unrelated concern. The affairs and debts of Dairyland and Dairy Cows became intertwined. Involuntary bankruptcy proceedings were instituted against Dairyland on December 23, 1975, and it filed voluntary proceedings in February 1976. This suit by Dairyland’s Trustee in Bankruptcy (“the Trustee”) and Brazos generally claimed that Newton and Mesker transferred Dairyland cows mortgaged to Equico without applying the proceeds to the mortgage debt, and that Equi-co conspired with them and applied Dairy- *1347 land assets to discharge unsecured Dairy-Cows indebtedness to Equico, to the prejudice of both of Dairyland’s general creditors and of Brazos in its capacity as a holder of a lien on the ranch inferior to that of Equico. The Trustee also asserted a usury claim against Equico respecting its loan to Dairyland.
Background
In 1972 Roberts, Newton, and Mesker formed Dairyland. Roberts then owned and controlled Brazos. At the same time, Newton and Mesker were partners in Dairy Cows, a business that involved buying cows and then “leasing” them to dairy farmers who would make assignments of milk to Dairy Cows and make payments on the leases. The “leases” or “cow contracts” were in effect sales with a retention of a security interest or mortgage. Dairy Cows financed its operations by assigning these “lease” contracts to lenders at a discount. Although the partnership borrowed money from Misco (and from Seneca State Bank and First National Bank of Waco), the principal lender with which Dairy Cows did business was Equico. The basic arrangement entered into by Roberts, Newton, and Mesker in the formation of Dairyland was that Roberts, through Brazos, would furnish the land and equipment for the Dairy-land operations, and Newton and Mesker would furnish their know-how in the dairy business and their ability to obtain financing. Roberts received fifty percent of the original Dairyland stock, and Newton and Mesker each received twenty-five percent.
As part of the agreement between Roberts, Newton, and Mesker, Brazos sold a some 816 acre ranch it owned in Bosque County to the recently incorporated Dairy-land for approximately $1,000,000. The purchase price was payable $200,000 in cash, with a note for $772,050. At the time of this sale John Hancock Life Insurance Company (“Hancock”) had a lien on the ranch, and Brazos was indebted to Hancock for approximately $280,000. Dairyland financed the down payment for the ranch with a $200,000 loan from Equico. Dairy-land was to have 49 acres free and clear of the Hancock lien. In order to secure the $200,000 loan, Dairyland gave Equico a first lien on the 49-acre tract and a lien second to that of Hancock on the remaining 767 acres. Brazos subordinated its vendor’s lien on the entire ranch to the lien in favor of Equico. Brazos also agreed to continue making payments on the Hancock note. Dairyland would pay interest only on its $772,050 note to Brazos for the first eleven years, but in the twelfth year the Hancock note would be paid off and the balance on Dairyland’s note to Brazos would become due. The status, then, of the ranch as of May 10, 1972 was that on the 49 acres Equico had a first lien securing its $200,000 purchase price advance and Brazos had a second lien securing its $772,-050 note; and on the remaining 767 acres Hancock had a $280,000 first lien, Equico had a second lien, and Brazos had a third lien and the obligation to pay off the Hancock note as it matured.
In order for Dairyland to obtain a dairy herd, the parties structured a transaction in which Dairyland bought 626 Holstein heifers with money borrowed from the First National Bank in Waco, Texas. Dairyland then sold these cows to Dairy Cows, repaying the First National Bank in Waco with the proceeds of this sale, and Dairy Cows in turn “leased” the cows back to Dairyland, and subsequently assigned these leases to Equico, which provided $313,000 to finance the acquisition of these cows. The cow leases assigned to Equico were secured by the deed of trust on the ranch which primarily secured the $200,000 land acquisition debt from Dairyland to Equico, by virtue of the general “other indebtedness” provisions of that deed of trust. Brazos also subordinated its liens on the ranch to the cow debt of Dairyland to Equico. Furthermore, Roberts, Newton, and Mesker individually guaranteed Dairy-land’s debts to Equico.
In addition to its own herd, Dairyland took in “custom” grazing, allowing cattle owned by third parties to graze on the ranch, for which the owners paid Dairyland a rental fee. Beginning in February 1973, *1348 Dairyland also received, for grazing on the ranch, cattle owned by Dairy Cows. These cattle had been repossessed by Dairy Cows from its defaulting lessees. A number of the leases had been collaterally assigned by Dairy Cows to Misco as security for Dairy Cows’ indebtedness to Misco. Dairyland paid the lease payments on these repossessed cattle and in turn kept any milk they produced in addition to a $10 per month rental fee per nonmilk-producing cow that was to be paid by Dairy Cows. There was also evidence that, as between Dairyland and Dairy Cows, Dairyland had the option to assume the lease payments and become the owner of the cows subject to the leases, or to turn the cows back to Dairy Cows without further obligation.
Although Roberts was initially president of Dairyland, as a result of disagreements with Newton and Mesker he eventually resigned as president in July 1973. The Dairyland herd had declined to some 286 by December 3, 1974, and at that time there were also approximately 760 Dairy Cows cows on the ranch, some mortgaged to Equico, some to Misco, and some to others. On December 4, 1974, 356 of the Dairy Cows cows were rebranded by Newton and Mesker as Dairyland cows, bringing the Dairyland total to 632. On January 30 or 31, 1975, Newton and Mesker caused Dairyland to buy out all of Roberts’ stock, so Newton and Mesker became the sole Dairyland shareholders, and at the same time they adopted a resolution dispensing with directors’ meetings and providing that either alone could act for Dairyland.
This suit was filed in March 1976 by Dairyland’s Trustee in Bankruptcy against Newton, Mesker, Equico, and Misco. The Trustee later asserted claims against Roberts and Brazos, as also did Newton and Mesker. Roberts and Brazos also asserted claims against Newton, Mesker, and Equi-co. In 1978 the Trustee dropped all claims against Misco, and it passed out of the suit. Just prior to trial, the Trustee, Roberts, and Brazos settled all claims between them.
Jury Findings
The jury found in relevant substance (interrogatory numbers indicated in parentheses) as follows:[1]
(1 & 2) on December 4, 1974 Dairyland was insolvent and Equico then knew, or should have known, that it was;
(3) Newton and Mesker (but not Roberts), in their capacity as officers of Dairyland and with “actual intent to hinder, delay or defraud existing or future creditors” of Dairyland, caused Dairy-land to cease doing business as an ongoing concern “on January 31, 1975,” and Equico, with like “actual intent,” conspired with them to do so;
(4 & 5) “on and after January 31, 1975” Newton and Mesker, with “actual intent to hinder, delay or defraud existing or future creditors” of Dairyland, caused Dairyland to transfer cows it. owned (of unspecified number and value) to Dairy Cows “without fair consideration”;
(6) Equico “first” knew on December 4, 1974 that Dairyland “had transferred any” of its 626 cows to Dairy Cows;
(7) Equico “failed to act” respecting the 626 Dairyland cows “mortgaged” to it “with the ordinary degree of care that would be expected from a creditor in [its] ... position under the same or similar circumstances”;
(8 & 9) “Newton and Mesker caused Dairyland to transfer” an unspecified number of cattle “owned by Dairyland and mortgaged to Equico without applying the proceeds [of the transfer] to reduce the mortgage” debt, and Equico conspired with them to do so, each party in so conspiring having acted “wantonly, maliciously or oppressively,” and the fair market value “of the cattle so transferred” being $280,108;
(12 & 13) “Newton and Mesker transferred” 206 Dairy Cows cattle covered by *1349 leases to Misco which Dairyland had assumed, “without applying the proceeds [of the transfer] to reduce the [lease] debt owed to Misco,” and Equico conspired with them to do so, each party so conspiring having acted “wantonly, maliciously or oppressively,” the difference between the fair market value of such 206 cattle ($103,000) and “the balance remaining due to Misco on the cattle so transferred” ($64,692) being $38,308;
(14 & 15) out of the money that “was received by Equico from the sale or other disposition of Dairyland cattle,” the amount which was so received by Equico but was “not applied to reduce the debt of Dairyland to Equico on those cows” was $150,193;
(18) Roberts did not consent to any of the transfers made by Dairyland “on or after January 31, 1975 without applying the proceeds to Dairyland’s secured debt”;
(11) Newton and Mesker, acting wantonly, maliciously or oppressively, and without the consent of Brazos, transferred Dairyland equipment having a fair market value of $50,000, on which Brazos had a lien, without applying the proceeds to the thus secured debt of Dairy-land to Brazos;
(19) between May 20, 1972, when Dairyland was formed, and December 23, 1975, when it went into bankruptcy, Newton and Mesker “advanced to Dairy-land” $280,738;
(16) Newton and Mesker should pay in punitive damages $150,000 to Brazos and $300,000 to the Trustee;
(17) Equico should pay in punitive damages $150,000 to Brazos and $300,-000 to the Trustee.
Trial Court Judgment
The trial court’s judgment awarded damages as follows. First, the Trustee was given judgment against Equico, Newton, and Mesker, jointly and severally, in the amount of $372,087.74, consisting of $300,-000 exemplary damages (jury findings 16 & 17) and $72,087.74 actual damages. The trial court calculated the $72,087.74 actual damages as follows. The $280,108 value of the Dairyland cows which were transferred, pursuant to the Equico-Newton-Mesker conspiracy, without applying the transfer proceeds to the secured debt on such cows owed by Dairyland to Equico (jury findings 8 & 9), plus the $38,308 “lost” Dairyland “equity” in the 206 cows leased to Misco which were transferred, pursuant to the Equico-Newton-Mesker conspiracy, without applying the transfer proceeds to the lease debt to Misco (jury findings 12 & 13), gave the trial court a total of $318,416 “gross” actual damages. From this $318,-416 figure the trial court subtracted the sum of $273,361.16 which it found to be the amount which Dairyland owed to Equico, secured by Equico’s liens, as of May 1975, leaving a “net” of $45,054.84 as of May 1975.[2] This $45,054.84 net, plus prejudgment interest thereon from May 1975 to December 1981 in the amount of $27,-032.90, produced the total actual damage award of $72,087.74. No party objected to this setoff procedure or concept (though Equico does complain of the amounts and the May 1975 date).
Nextj the trial court awarded the Trustee an additional $18,425 actual damages against Equico, representing sums[3] the trial court found the Trustee had mistakenly paid Equico since bankruptcy in respect to the Dairyland debt to Equico.
Judgment was awarded Brazos against Equico, Newton, and Mesker, jointly and *1350 severally, for $150,000 exemplary damages (jury findings 16 & 17). Brazos was also awarded $80,000 in actual damages against Newton and Mesker, jointly and severally, consisting of the $50,000 worth of Dairy-land equipment which those two transferred, without applying the proceeds to reduce the Dairyland debt to Brazos secured by this equipment (jury finding 11), plus $30,000 prejudgment interest thereon from January 1976.
Prior to trial, the entire ranch had been sold by the Trustee to a third party in the course of the bankruptcy proceedings with the approval of the bankruptcy court and Brazos. From the sales proceeds the Hancock first lien had been completely paid off, and the remaining net proceeds, apparently something slightly in excess of $300,000,[4] were being held in the bankruptcy court pending the outcome of the trial below. In its judgment here, the trial court wholly cancelled all liens held or claimed by Equico on the ranch “or the sales proceeds thereof,” and further decreed that the lien reserved by Brazos in its deed of the ranch to Dairyland and the lien of the deed of trust on the ranch from Dairyland to Brazos “are hereby declared to be valid and effective against all parties hereto, save and except the purchaser from the Trustee in Bankruptcy and those holding under such purchaser.” No party has objected to this procedure as such; that is, there has been no question as to the propriety of applying whatever recovery the Trustee may have been entitled to on its substantive claims against Equico to the reduction (and extinguishment) of Dairyland’s debt to Equico secured by Equico’s lien on the ranch.
By consent of the parties, the trial court determined the usury issue. It denied- the Trustee any recovery against Equico on this basis, ruling that the Dairyland note and deed of trust to Equico were not usurious, and that Equico did not charge Dairy-land usurious interest.
Equico, Newton, and Mesker appeal,[5] and the Trustee cross-appeals the denial of its usury claim.
II.
EVIDENTIAL BASIS OF FINDINGS ON WHICH TRUSTEE’S RECOVERY PREDICATED
Standard of Review
In evaluating the defendants’ claim that the jury findings were not supported by sufficient evidence, we do not reweigh evidence or set aside the jury findings complained of merely because we might draw different inferences or conclusions from the evidence. Rather, we sit to determine whether there was any substantial evidence in the record that fairly tends to support the verdict. Gross v. Black & Decker (U.S.), Inc., 695 F.2d 858 (5th Cir.1983). Furthermore, we must consider all reasonable inferences from the evidence which support the challenged findings. Pope v. Rollins Protective Services Co., 703 F.2d 197 (5th Cir.1983). We also bear in mind that a conspiracy may be proved by circumstantial evidence. See Lenard v. Argento, 699 F.2d 874, 883 (7th Cir.), cert. denied, — U.S. -, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983) (quoting Hoffman-La-Roche, Inc. v. Greenberg, 447 F.2d 872, 875 (7th Cir.1971)); Fisher v. Shamburg, 624 F.2d 156, 162 (10th Cir.1980); Industrial *1351 Building Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1343 (9th Cir.1970).
“Since conspiracies, whether among businessmen or others, are rarely evidenced by explicit agreements, the determination of whether a conspiracy existed almost inevitably rests on the inferences that may fairly be drawn from the behavior of the alleged conspirators. At a minimum, their actions, to support a finding of a conspiracy, must suggest a commitment to a common end. ‘[T]he circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.’ American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575, 1594 (1946).” Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir.), cert. denied, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).
Nevertheless, “[a] mere scintilla of evidence is insufficient to present a question for the jury,” and “[t]here must be a conflict in substantial evidence to create a jury question.” Boeing Company v. Shipman, 411 F.2d 365, 375 (5th Cir.1969). Moreover, “[a] jury may not rest its verdict on speculation and conjecture,” Gulf Coast Real Estate Auction Co. v. Chevron Industries, Inc., 665 F.2d 574, 577 (5th Cir.1982); Fenner v. General Motors Corp., 657 F.2d 647, 651 (5th Cir.1981), cert. denied, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982), and the jury’s freedom to draw inferences from the evidence does not extend so far as to allow a wholly “unreasonable inference” or one which amounts to “mere speculation and eonjec-ture.” Bridges v. Groendyke Transport, Inc., 553 F.2d 877, 878-79 (5th Cir.1977).
Basic Liability Findings
The judgment for actual damages in favor of the Trustee rests essentially on two sets of jury findings: first, that Equico, Newton, and Mesker conspired to cause Dairyland to transfer cattle worth $280,108 owned by it and mortgaged to Equico without applying the proceeds to the mortgage (findings 8 & 9); and, second, that they conspired to cause Dairyland to transfer 206 cows mortgaged to Misco, and worth $38,308 more than the Misco mortgage debt that Dairyland had assumed, without applying the proceeds to reduction of the Misco debt (findings 12 & 13).
The total of the two sums ($280,108 and $38,308) produced the amount of actual damages awarded the Trustee, namely, $318,416.[6] In each of the two referenced conspiracies all defendants were found to have acted “wantonly, maliciously or oppressively,” but there was no finding of any intent to hinder, delay, or defraud creditors or others in either connection.[7] The findings concerning the transfer of the cattle worth $280,108 mortgaged to Equico and of those mortgaged to Misco in which Dairyland’s “equity” was $38,308, do not speak to the identity of the transferee, the adequacy of the consideration, or who ultimately received it, except that it was not applied to the respective mortgage debts. However, the jury also found that out of the monies Equico received from disposition of Dairyland cattle the amount thereof which was not applied to reduce the Dairy-land debt to Equico was $150,193 (findings 14 & 15).[8]
*1352 Equico Mortgaged Cattle Conspiracy ($280,108)
As noted, the principal component of the Trustee’s actual damage recovery was based on the findings that Newton and Mesker, pursuant to a conspiracy with Equico, transferred Dairyland cattle mortgaged to Equico, and worth $280,108, without applying the proceeds to the Equico mortgage.-
The factual theory on which the Trustee tried the case and argued it to the jury, and the statement of the Trustee’s position in this respect as set out in the trial court’s charge to the jury, were that these cattle were comprised of three distinct groups.
(1) The first group consists of 188 cows transferred from Dairyland to Dairy Cows and then promptly sold by Dairy Cows (under security interest “leases” which were in effect mortgages) in negotiated transactions to various individual third-party purchasers. The transfers from Dairyland to Dairy Cows were in consideration of reduction of preexisting Dairyland debt to Dairy Cows. When Dairy Cows sold the cows to the third parties, the latter executed “leases” in favor of Dairy Cows which were immediately assigned by Dairy Cows to Equico. Equico thereupon' gave Dairy Cows credit for the purchase price of the “lease,” the credit going to reduce Dairy Cows’ outstanding debt to Equico. The third-party purchasers thereafter made their “lease” payments to Equico. These transactions took place in February, March, and April 1975. The total amount credited by Equico to Dairy Cows in connection with Equieo’s “purchase” of these “leases” was $150,193. None of the amounts received in these transactions was credited to Dairyland or applied on its debt to Equico. It is to be noted that the $150,193 figure in relation to these 188 cattle corresponds exactly with the jury findings (numbers 14 & 15) that of the monies Equico received from the disposition of Dairyland cattle, $150,193 thereof was the amount which Equico did not apply to Dairyland’s debt to it. We hold there is ample evidence to support this figure. Equico’s principal claim, however, is that there is no evidence it knew the cows were Dairyland cows. We reject this contention. There is ample evidence that Equico then knew Dairyland was insolvent and that Dairy Cows was in serious financial difficulty. In connection with the third-party lease transactions on these 188 cows, Dairy Cows furnished Equico documentation indicating that the cows had Dairyland brands and had just been transferred by Dairyland to Dairy Cows for preexisting indebtedness. Additionally, there was evidence that in late April 1975 Equico had agreed that the proceeds of the lease assignments covering some 100 of these cattle would be credited to Dairyland’s debt, but instead subsequently applied those sums to the Dairy Cows debt. The jury was not required to credit the explanations made by Equico. Since the indebtedness of Dairy Cows to Equico was inadequately secured, while that of Dairyland was secured by a lien on the ranch, it was to Equico’s advantage to in effect use Dairyland cows to reduce Dairy Cows’ debt to Equico rather than Dairyland’s. As to these 188 cows and the related $150,193 we hold that the jury finding of conspiracy is adequately supported.
(2) The second component of the $280,-108 worth of cattle consists of approximately 275 Dairyland cows mortgaged to Equico which were sold by Dairyland at auction at various times commencing December 7, 1974 and extending into April or *1353 May 1975, for a total of $64,465 cash. The evidence shows that these sums were received by Dairyland and used by it in its operations. There is no evidence or claim that any of the funds went to Equico (and indeed jury findings 14 & 15 are in effect to the contrary) or Dairy Cows, or that the consideration was inadequate (and indeed jury findings 8 & 9, stating the fair market value of all the transferred cattle, are implicitly to the contrary). There was evidence from which the jury could infer that Equico knew of at least some of these sales and did not object to them. While it is questionable that the jury could legitimately find that Equico actually conspired to effect these sales, we do not reach that question because, for the reasons stated below, we hold that in any event the Trustee’s recovery in respect to these transactions may not be sustained.
(3) The third and final group of cattle making up the $280,108 is comprised of some 114 Dairyland cows mortgaged to Equico which Dairyland transferred to Dairy Cows in consideration of preexisting indebtedness and were then promptly sold by Dairy Cows to various individual third parties in transactions of the same type as those involving the 188 cattle described in (1) above. However, in the transactions involving these 114 cows, Dairy Cows assigned the “leases” given by the third-party purchasers not to Equico but rather to Misco. Misco paid Dairy Cows a total of $65,450 for these cow leases (and we reject appellants’ assertion that there is insufficient evidence to support this amount). One of these transactions occurred on January 31, 1975, and the other two in February 1975. There is no evidence or finding that any of this $65,450 ever reached Equico’s hands, and jury findings 14 and 15 are at least an implicit determination to the contrary. Moreover, there is no substantial evidence that Equico knew that Dairy-land cattle on which it had a mortgage were being sold by Dairy Cows in sales financed by Misco. The Trustee argues that this would be to Equico’s advantage, as it brought fresh money to its debtor Dairy Cows. However, Equico’s security was impaired to the same extent. We conclude that the finding that Equico conspired to have these 114 cattle disposed of without applying the proceeds to reduce the Dairyland debt to Equico is based on no more than speculation and conjecture and cannot stand. The evidence is, however, sufficient to support the conspiracy finding in this respect as to Newton and Mesker, who acted for both Dairyland and Dairy Cows in these transactions.
Misco Assumption Cattle Conspiracy ($38,308)
The remaining portion of the Trustee’s actual damage recovery was based on the jury findings (numbers 12 & 13) that Newton and Mesker, pursuant to a conspiracy with Equico, transferred 206 cows, worth $103,000, on which Misco held mortgages or leases having a balance of $64,692 which Dairyland had “assumed,” without applying the proceeds of the transfer to reduce the lease debt. The Trustee’s theory in this regard was that Dairyland thus lost its $38,308 “equity” in these cows.
There was testimony that Dairy Cows would periodically repossess cattle it had owned and leased to various farmers, with Dairy Cows’ having assigned the leases to Misco. Dairy Cows entered into arrangements with Dairyland concerning some of these repossessed cows by which Dairyland agreed to graze the cattle and make the lease payments to Misco, in return for which Dairyland would be entitled to the milk produced plus $10 per month to be paid by Dairy Cows for nonmilk-producing cows. The agreements provided that Dairyland could assume the unpaid lease balance at any time and in effect become the owner of the cattle subject to the lease debt; it could also “quit renting the cows or bulls at any time without further obligation.” Dairyland made payments on the leases for a considerable time. Though somewhat unclear, the evidence indicates that in the spring of 1975 these cows ended up with Dairy Cows. Newton testified by deposition that this came about because “Dairyland couldn’t continue making the *1354 payments.” However, as the cattle were worth $38,308 more than the debt against them,[9] it could be found that Dairyland was able to sell these cattle and net that amount, but that Newton and Mesker caused Dairyland to instead transfer the cattle to Dairy Cows, without fair consideration, so that the latter could realize this $38,308 equity. What happened to the cows thereafter is unclear. Dairy Cows seems to have leased some to third parties and sold some at auction. There is no showing of how much Dairy Cows actually realized on these cows. There is no evidence or finding that Equico took leases on any of them or received any of the proceeds of their disposition, or that Equico was privy to the details of the arrangements between Dairyland and Dairy Cows in this respect. We hold that findings that Equico conspired with Newton and Mesker respecting these cows is based on no more than speculation and conjecture, and cannot stand. However, there is evidence to support the findings as to Newton and Mesker regarding these Misco “assumption” cattle.
III.
THE TRUSTEE’S LEGAL BASES FOR RECOVERY
Equico, Newton, and Mesker further argue that the findings and evidence present no legal basis on which the Trustee’s actual damages recovery can be sustained. The Trustee advances three basic legal theories in support of its recovery, namely, conversion, civil conspiracy, and fraudulent conveyance under both the Bankruptcy Act[10] and the Texas fraudulent conveyance statute. We consider these in the order indicated.
Conversion
The Trustee has focused its arguments before this Court on the theory of conversion. For several reasons, we find that none of the recovery can be sustained on this basis.
To begin with, we note that the jury made no finding of any conversion. The Trustee points out that the trial court’s judgment makes reference to the $318,416 (the $280,108 and the $38,308), on the basis of which the Trustee’s actual damage award was calculated, as “representing the fair market of cattle converted by” Newton, Mesker, and Equico, and correctly urges that the absence of jury findings is not fatal due to the provisions of Fed.R. Civ.P. 49(a). Nevertheless, we hold that there is insufficient evidence to sustain the conversion theory of recovery.
With respect to that portion of the $280,-108 worth of cattle represented by the some 275 cattle sold at auction for $64,465 cash, the evidence shows that these cattle were sold by Dairyland and the proceeds of sales were placed in its bank account and used by it in its operations. This is simply no character of conversion. All of the other Dairyland cattle making up the cattle worth $280,108 were transferred by Dairy-land on or after January 31, 1975. The transfers were made by bills of sale, executed by Newton or Mesker, from Dairy-land to Dairy Cows, in consideration of cancellation of preexisting Dairyland indebtedness to Dairy Cows. Regardless of the adequacy of the consideration, there is no basis for any determination that the transfers were not duly made, fully authorized, and consented to by Dairyland. Newton and Mesker were the sole owners of Dairyland and had full and complete authority to act for it. “Conversion involves a taking of property without the owner’s consent; hence there can be no conversion where the owner has expressly or impliedly assented to the taking or disposition.” 15 Tex.Jur.3d, Conversion § 3 at 11. Since Dairyland consented to, indeed made, the transfers, there was no conversion. The same principle applies to *1355 the Misco “assumption” cattle which Dairy-land let go back to Dairy Cows in the spring of 1975 thereby losing $38,308 of “equity.” Again, Newton and Mesker acted for Dairyland, were its sole owners, and were fully authorized.
The Trustee, however, apparently seeks to avoid the effect of the foregoing on the theory that he stands in the position not of Dairyland but of its general creditors, and that hence Dairyland’s consent does not vitiate the conversion. We hold that this theory is without merit. Under Texas law it is well settled that in order to recover on a theory of conversion one must at the time of the conversion either have some character of ownership interest in the specific property converted or be in legal possession of it or then entitled to its possession. Catania v. Garage De Le Paix, Inc., 542 S.W.2d 239, 242 (Tex.Civ.App.— Tyler 1976, writ ref’d n.r.e.) (“A plaintiff who has not shown title or some other right to possession of the property allegedly converted may not maintain a suit in conversion.”); Lone Star Beer, Inc. v. Republic Nat. Bank of Dallas, 508 S.W.2d 686, 687 (Tex.Civ.App. — Dallas 1974, no writ) (“ ‘In order to recover on a theory of conversion, it is necessary that ... [the plaintiff] allege and prove one of three things, that being, that it is the owner of the property converted or that it had legal possession of the property so taken or that it is entitled to possession.’ ” (quoting with approval Lone Star Beer, Inc. v. First National Bank of Odessa, 468 S.W.2d 930, 934 (Tex.Civ.App. — El Paso 1971, no writ)).[11] Dairyland’s general creditors did not, at the time of the alleged conversions, have any ownership interest in the specific cattle allegedly converted or the possession, or right to immediate possession, thereof. See Estate of Stonecipher v. Estate of Butts, 591 S.W.2d 806, 808 (Tex. 1979), in which the Texas Supreme Court quoted with approval a passage from the annotation in 2 A.L.R. 287-93 including the statement that “ ‘... it is clear that a mere general creditor without a lien has no interest in the debtor’s property,’ ” and went on to state, “In Le Gierse et al. v. Whitehurst, 66 Tex. 244, 18 S.W. 510 (1886), it was held that a general creditor has no right in or lien upon property of the debtor ____”[12] Accordingly, the Trustee cannot avoid the effect of Dairyland’s consent on the theory that its general creditors did not consent, for the general creditors, so far as they did not stand in Dairyland’s position, had no interest sufficient to support an action for conversion.
This result is not altered by the provisions of section 70c of the Bankruptcy Act, 11 U.S.C. § 110c (1976), generally giving the Trustee “as of the date of bankruptcy the rights and powers of” a creditor “who upon the date of bankruptcy obtained” either a judgment or execution returned unsatisfied against the bankrupt or a lien by legal or equitable proceedings on all property on which a simple contract creditor of the bankrupt could have obtained a lien. The Trustee's rights under these provisions “are to be ascertained as of ‘the date of bankruptcy,’ not at an anterior point of time.” Lewis v. Manufacturers National Bank of Detroit, 364 U.S. 603, 607, 81 S.Ct. 347, 349, 5 L.Ed.2d 323 (1961) (footnote omitted). The date of bankruptcy for these purposes is the date the petition is filed, id. *1356 at 607 n. 5, 81 S.Ct. at 349 n. 5, which in this case was December 23, 1975, many months after the “conversions,” the last of which was in May 1975. The hypothetical creditor who first acquired a judgment or lien against Dairyland and its property in December 1975 could not maintain an action for a claimed conversion in May 1975 of Dairyland property, for the creditor would have had, at the time of the conversion, no interest in or right of possession of the property allegedly converted. Further, “Section 70c ... has no application as to rights other than rights against property.” 1 Collier Bankruptcy Manual § 70.30[2] at 1018 (2d ed. 1978) (footnote omitted). It does not give to the Trustee “the creditor’s right to an in personam judgment.” First National Bank of Herkimer v. Poland Union, 109 F.2d 54, 56 (2d Cir.), cert. denied, 309 U.S. 682, 60 S.Ct. 723, 84 L.Ed. 1026 (1940).[13]
Accordingly, we reject the Trustee’s conversion theory of recovery.
Civil Conspiracy
Nor do we find that the Trustee has any cause of action for civil conspiracy. The Texas Supreme Court has held that a general creditor does not have a cause of action for civil conspiracy when a debtor’s property is conveyed to others to evade payment. Estate of Stonecipher v. Estate of Butts, supra. The essence of a cause of action for conspiracy is damage resulting from the commission of a wrong which injures another, and not the conspiracy itself. The damage suffered by a general creditor when property is fraudulently conveyed to another to evade payment is the deprivation of an opportunity to make a levy on the property. This damage, however, is too remote to support recovery. Stonecipher, 591 S.W.2d at 808. Therefore, since the Trustee is a representative of Dairyland’s general creditors in this action, it has suffered rio damage for which it may recover under a cause of action for civil conspiracy as such. For the reasons discussed above in connection with the Trustee’s conversion theory, the Trustee’s civil conspiracy theory of recovery is not enhanced here by section 70c of the Bankruptcy Act, nor by sections 67 or 70e. However, recovery under the latter sections themselves is a different matter, to which we now turn.
Fraudulent Conveyance
We finally consider the Trustee’s fraudulent conveyance theory of recovery. This recovery is premised on sections 67d and 70e of the Bankruptcy Act, 11 U.S.C. §§ 107d & 110e (1976), and on the Texas fraudulent conveyance statute, Tex.Bus. & Comm.Code Ann. § 24.02 (Vernon 1968).
Bankruptcy Act
We first consider the claim under the Bankruptcy Act. Section 67d(2) describes the following “transfer[s] made ... by a *1357 debtor within one year prior to” the date of bankruptcy as being “fraudulent”:[14]
“Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; or (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent; or (c) as to then existing and future creditors, if made or incurred without fair consideration by a debtor who intends to incur or believes that he will incur debts beyond his ability to pay as they mature; or (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors.”
The rights of the trustee in bankruptcy respecting fraudulent transfers are specified in sections 67d(6) and 70e.[15] Section 67d(6) states that such transfers “shall be null and void against the trustee.” This same language (with “as against” substituted for “against”) is repeated in section 70e(l). Section 70e(2) further states that “... every such transfer or obligation shall be avoided by, the trustee for the benefit of the estate” and that “[t]he trustee shall reclaim and recover such property or collect its value from and avoid such transfer or obligation against whoever may hold or have received it.”
However, the general rule under the Bankruptcy Act is that one who did not actually receive any of the property fraudulently transferred (or any part of a “preference”) will not be liable for its value, even though he may have participated or conspired in the making of the fraudulent transfer (or preference). The reasons for this rule are well explained in Elliott v. Glushon, 390 F.2d 514 (9th Cir.1967). There the. Court noted that "[t]he literal terms of the sections [sections 60, 67 and 70] suggest with some certainty that recovery may be had only against persons who have received the property in question.” Id. at 515.[16] It specifically rejected the *1358 argument, “based on the general principle that joint tortfeasors are jointly and severally liable,” that “in the case of a conspiracy all conspirators should be held subject to ‘recovery’ under the quoted sections regardless of whether they have physically received the property in question.” Id. The Court reasoned as follows:
“The purpose of those sections of the Bankruptcy Act which are here relevant is clearly to preserve the assets of the bankrupt; they are not intended to render civilly liable all persons who may have contributed in some way to the dissipation of those assets. The Act carefully speaks of conveyances of property as being ‘null and void,' and authorizes suit by the trustee to ‘reclaim and recover such property or collect its value.’ The actions legislated against are not ‘prohibited’; those persons whose actions are rendered ‘null and void’ are not made ‘liable’; and terms such as ‘damages’ are not used. The legislative theory is cancellation, not the creation of liability for the consequences of a wrongful act.” Id. at 516.[17]
The Ninth Circuit has reaffirmed Elliott, see In re Christian & Porter Aluminum Co., 584 F.2d 326, 339 (9th Cir.1978), and it has been followed by the First, Second, and Eighth Circuits. See Robinson v. Watts Detective Agency, 685 F.2d 729, 737-38 (1st Cir.1982), cert. denied, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953, 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983); Klein v. Tabatchnick, 610 F.2d 1043, 1048 n. 4 (2d Cir.1979); Jackson v. Star Sprinkler Corp., 575 F.2d 1223, 1234 (8th Cir.1978). We are aware of no case which has declined to follow Elliott.
There is an exception to the general Elliott rule for those cases in which a person does not actually directly receive the transferred property, but nevertheless indirectly receives it or receives its proceeds or value. Thus, in Duell v. Brewer, 92 F.2d 59, 61 (2d Cir.1937), the Court noted that under both New York law and the Bankruptcy Act one “who takes active part in procuring a preference,” though not liable for all resulting loss, “must be liable for any part of the property which he actually receives,” and continued by stating:
“[I]f the transferee directed the property to be turned over to his creditor, he would be as much liable as though he received it himself____ Similarly, if a creditor of the transferee joins with the transferee to secure the preference, and receives it in discharge of the debt, he must be liable, at least to the extent that the transferee cannot respond.”
See also Aulick v. Largent, 295 F.2d 41 (4th Cir.1961); National Bank v. National Herkimer County Bank, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1911); 4 Collier on Bankruptcy § 547.53[1] at 547-160.10 (15th ed. 1984). Another example of this exception is illustrated by Brainard v. Cohn, 8 F.2d 13 (9th Cir.1925), where there had *1359 been an “intentional intermixture of the goods of the debtor with the goods of those acting in collusion with him, so that separation is practically impossible.” Id. at 15.
We now apply these principles to the various transfers found by the jury and shown by the evidence.
We hold that the Trustee made out a case against Equico, Newton, and Mesker under sections 67d and 70e with respect to the 188 Dairyland cattle, worth $150,193, mortgaged to Equico which were transferred from Dairyland to Dairy Cows and thereupon sold by the latter to third parties, with the $150,193 proceeds going to Equico and being applied to reduce Dairy Cows’, rather than Dairyland’s, debt to it. As noted, there was sufficient evidence of a conspiracy for this purpose, respecting these transactions, between Newton, Mesker, and Equico, as found by the jury. While the jury did not find that the transfers were made either without fair consideration or with actual intent to hinder, delay, or defraud creditors,[18] one or the other of which findings is required under section 67d(2), nevertheless such findings can be implied in support of the judgment under Fed.R.Civ.P. 49(a), there being adequate supporting evidence and the failure to submit these matters to the jury not having been objected to below.[19] On the same basis, we also imply, to the extent necessary, findings that these transfers were in effect received by Equico as the proceeds were paid to it,[20] and that they were likewise received by Newton and Mesker as the proceeds were applied to reduce the debt of Dairy Cows (i.e., Newton and Mesker individually) to Equico. Accordingly, we sustain the Trustee’s recovery against Equico, Newton, and Mesker under sections 67 and 70 with respect to these particular 188 cattle worth $150,193.
We next consider the some 275 Dairyland cows which were mortgaged to Equico and were sold at auction to third parties by Dairyland for $64,465 cash which was deposited in the Dairyland bank account and used by it in its operations. As previously observed, the jury found that these sales were made pursuant to a conspiracy between Newton, Mesker, and Equico. However, there is no finding, nor any sufficient evidence on which an implied finding can be based, that any of the defendants ever received,, directly or indirectly, any of these cattle. Dairyland itself received the proceeds, and there is no finding or evidence any of the defendants did so, directly or indirectly. The jury in effect found that Equico did not (findings 14 & 15). There Was no “intermingling,” except with Dairyland’s own funds. The Trustee argues that the defendants received a benefit from the fact that these funds helped Dairyland continue to operate. While this-may be so, such a benefit does not suffice to take the situation out of the Elliott rule. Elliott rests on the proposition that “[t]he legislative theory is cancellation, not the creation of liability for the consequences of a wrongful act.” 390 F.2d at 516. The exceptions are essentially consistent with this “disgorging” approach: one must return what one has wrongfully received. The Trustee’s theory is inconsistent with this: it is based on an incidental, unquanti *1360 fiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received. Hence it essentially is no more than “the creation of liability for the consequences of a wrongful act.” It would, at the least, turn the Elliott doctrine from the general rule into a narrow, difficult to apply, and essentially meaningless exception. This we decline to do.[21] Accordingly, we hold that the Bankruptcy Act does not afford the Trustee any basis for recovery against any of the defendants in respect to these cattle sold at auction.
The remainder of the $280,108 worth of Dairyland cattle transferred were those approximately 114 head mortgaged to Equico which were transferred to Dairy Cows and thereupon sold by it to diverse third parties on “leases” which Dairy Cows promptly assigned to Misco for $65,450. With respect to Newton and Mesker, we imply findings under Fed.R.Civ.P. 49(a) that these transfers were without fair consideration to Dairyland, were made with actual intent to hinder, delay, or defraud creditors, and were received by Newton and Mesker, who, as Dairy Cows, received both the cattle and the proceeds thereof. Accordingly, we sustain the Trustee’s recovery under the Bankruptcy Act against Newton and Mesker respecting these 114 cattle worth $65,450. However, as to Equico the result must be different. We have held that there is insufficient evidence to link Equico to a conspiracy respecting the fraudulent transfer of these cattle. Moreover, there is no evidence (nor any finding) that Equico directly or indirectly received any of these cattle or any of the proceeds thereof. As noted, the jury found that Equico received and did not apply to Dairy-land’s debt only $150,193 out of the proceeds of the sale or other disposition of Dairyland cattle (findings 14 & 15). The $150,193 plainly refers to the 188 cattle discussed above. For the reasons previously stated, we reject the Trustee’s theory that Equico is nevertheless liable because the transactions benefited its debtor Dairy Cows. There is no finding of any benefit to Equico, nor any evidence that any of the proceeds ended up with Equico. The Trustee has not established liability under the Bankruptcy Act against Equico as to the transactions involving these 114 cows.
The remaining transfers involved are those concerning the Misco “assumption” cattle in which Dairyland had a $38,-308 “equity.” We determine that findings may be implied that these cattle were transferred to Dairy Cows without fair consideration, that Newton and Mesker acted in this regard with actual intent to hinder, delay, and defraud creditors, and that Newton and Mesker (Dairy Cows) received the transfers. Accordingly, we sustain the Trustee’s Bankruptcy Act recovery against Newton and Mesker in respect to these cows. There is, however, no basis for such a recovery against Equico. As previously stated, there is insufficient evidence to link Equico to a conspiracy respecting the fraudulent transfer of these cattle. Moreover, there is no evidence, nor any finding, that Equico directly of indirectly received any of these cattle or the proceeds thereof. And, for the reasons given above, we reject the Trustee’s theory that Equico is nevertheless liable because the transactions benefited its debtor Dairy Cows. There is no finding of any benefit to Equico, nor any evidence that any of the proceeds ended up with Equico. We hold that the Trustee has not established Equico’s liability to it. under the Bankruptcy Act respecting these Misco “assumption” cows.
Summarizing our disposition of the Trustee’s claims in this regard, we sustain recovery under the Bankruptcy Act against Newton and Mesker as to all claims except only those respecting that portion of the cattle mortgaged to Equico that Dairyland sold at auction and for which it received the $64,465 sales proceeds; we further hold that the Trustee’s recovery on its claims *1361 against Equico under the Bankruptcy Act may be sustained only in respect to the 188 Dairyland cattle worth $150,193, mortgaged to Equico, the proceeds of which were received by Equico but not applied to Dairyland’s debt to it.
Texas Fraudulent Conveyance Statute
We now turn to the Texas fraudulent conveyance statute[22] to determine whether it provides a basis on which the Trustee’s recovery may be sustained on those claims as to which we have denied recovery under the Bankruptcy Act.
Although we have found no Texas decision in point, we are persuaded that the Texas statute, like the Bankruptcy Act, does not provide for recovery other than recovery of the property transferred or its value from one who is, directly or indirectly, a transferee or recipient thereof. The Texas statute does not purport to do anything other than render the transfer “void” with respect to designated persons. It operates against the title of an “innocent” transferee who has not paid value just as fully as against the title of a transferee who has participated in a fraud. It does not purport to vary its operation on the basis of participation in wrongdoing or the lack thereof. Nowhere does it purport, to prohibit any transfers or to render the making or receiving of them illegal or wrongful. The statute contains no words such as “damages” or “liability” or “actionable.” The reasoning of Elliott is hence fully applicable here. See 390 F.2d at 516-17.
Moreover, we note that this construction appears to be in accord with the general rule:
“[I]n no event can the fraudulent grantee be held liable in an amount greater than the value of the property transferred to him, without regard to how scandalous the fraud may be.” 37 C.J.S. § 444 at 1297-98 (footnote omitted).
Further, decisions construing the Texas bulk sales law[23] reinforce our conclusion in this regard. The transferee of property sold in violation of the Texas bulk sales statute has no personal liability unless he converts the property to his own use so as to place it beyond the reach of the creditors. B & H Auto Supply, Inc. v. Andrews, 417 S.W.2d 341 (Tex.Civ.App. — Dallas 1967, no writ). See also Hollis v. Boone, 315 S.W.2d 350 (Tex.Civ.App. — El Paso 1953, no writ) (any liability of buyer of assets of another to seller’s creditors under bulk sales law would not be a personal liability); Phillips v. Cargill, 131 S.W.2d 775 (Tex.Civ.App. — El Paso 1939, no writ) (transferee not personally liable under bulk sales law to creditor of transferor beyond the value of property transferred). Even where personal liability arises in those cases in which a purchaser disposes of or converts to his own use property acquired in violation of the bulk sales law, or places it beyond the reach of creditors, recovery will be limited to the *1362 value actually received. Settegast v. Second National Bank, 126 Tex. 330, 87 S.W.2d 1070, 1073 (1935).
Finally, a mere general creditor may take advantage of the Texas fraudulent conveyance statute,[24] but, as we have seen, may not recover damages for conspiracy to commit a fraudulent conveyance. It would essentially render meaningless the rule of Stonecipher, supra, that a general creditor may not recover damages under a civil conspiracy cause of action, if recovery could be had under the fraudulent conveyance statute for an amount in excess of the proceeds received by the defendant.[25]
We therefore conclude that. as to the claims at issue here the Texas fraudulent conveyance statute does not broaden the Trustee’s right of recovery beyond that afforded him by the Bankruptcy Act. Accordingly, we deny the Trustee recovery under the Texas fraudulent conveyance statute for the same claims as to which we deny recovery under the Bankruptcy Act.
Conclusion Respecting Trustee’s Recovery
Accordingly, our disposition of the Trustee’s claims of recovery is as follows: as against Equico the Trustee’s recovery of $150,193 on its claim respecting the 188 Dairyland cows mortgaged to Equico is sustained, but the Trustee is denied recovery on all its other above-discussed claims against Equico; as against Newton and Mesker, the Trustee’s claim of recovery respecting the some 175 Dairyland cows sold at auction is denied, but recovery on all its other mentioned claims is sustained. We turn now to consideration of the Trustee’s entitlement to punitive damages.
IY.
THE TRUSTEE’S RECOVERY OF PUNITIVE DAMAGES AGAINST EQUICO
Equico complains of the Trustee’s award of punitive damages against it. No complaint has been made by Newton and Mesker respecting the Trustee’s award of punitive damages against them. Consequently we examine the punitive damage issue solely as it relates to Equico.
In light of the legislative theory behind the fraudulent conveyance provisions of the Bankruptcy Act as articulated in Elliott v. Glushon, 390 F.2d 514, 516 (9th Cir.1967), quoted above, we find that punitive damages are not recoverable under sections 67 or 70 of the Bankruptcy Act. See also In re Checkmate Stereo and Electronics, Ltd., 9 B.R. 585 (N.Y. Bankr.Ct.1981); Chichester v. Golden, 204 F.Supp. 634 (S.D.Cal.1962), aff'd. in part *1363 and rev’d in part on other grounds, 321 F.2d 250 (9th Cir.1963). Further, our holdings concerning the Trustee’s substantive claims against Equico reduce the Trustee’s “gross” recovery from Equico below the amount of Dairyland’s secured debt to Equico allowed as an offset, so that the Trustee has suffered no actual loss. In these circumstances, recovery of exemplary damages would be particularly inappropriate.
As for the recovery of punitive damages under the Texas fraudulent conveyance statute, we have found no case precisely on point. Based on our foregoing analysis of the Texas statute in relation to the Trustee’s substantive claims, we have considerable doubt that exemplary damages are any more recoverable under it than under the Bankruptcy Act. It is true that Texas courts, contrary to what appears to be the majority rule, see 48 A.L.R.2d 947, 949, will hot deny exemplary damages simply because an action is equitable, rather than legal. See, e.g., International Bankers Life Insurance Co. v. Holloway, 368 S.W.2d 567 (Tex.1963). However, the main question concerning exemplary damages under the Texas statute arises not because the statute is equitable, as opposed to legal, but rather because, as previously observed, its text purports merely to declare certain transfers “void” as to specified persons, without providing that the making of the transfer is wrongful or illegal. Cf. Elliott. Also, in this circumstance Stonecipher points away from allowing a character of relief neither implicit in the statute itself nor available apart from it. Nevertheless, we need not resolve this question, as we hold that here the Trustee’s recovery of exemplary damages from Equico under Texas law is in any event barred by the recognized Texas rule that “exemplary damages cannot be recovered unless the plaintiff is shown to have sustained actual loss or injury____ A verdict of nominal actual damages is not sufficient.” Fort Worth Elevators Co. v. Russell, 123 Tex. 128, 70 S.W.2d 397, 409 (1934). See also Forbau v. Producers Gas Co., 601 S.W.2d 550, 552 (Tex.Civ.App.— Amarillo 1980, no writ); 28 Tex.Jur.3d Damages § 188 (“Exemplary damages may not be recovered unless plaintiff is shown to have sustained actual loss or injury____ [Njominal damages is not sufficient____”).
Hence, even while allowing exemplary damages in equitable actions, Texas courts have also stated that such recovery must be supported by a finding of actual loss or damage. See National Bank of Commerce v. May, 583 S.W.2d 685, 691-92 (Tex.Civ.App. — Eastland 1979, writ ref’d n.r.e.); Bibby v. Preston, 555 S.W.2d 898, 903 (Tex.Civ.App. — Tyler 1977, no writ); Adam v. Harris, 564 S.W.2d 152, 156 (Tex.Civ.App. —Houston [14th Dist.] 1978, writ ref’d n.r. e.). The Texas Supreme Court stated in Holloway that “the remedy selected in relation to the actual harm done the plaintiff, together with the nature of the acts of the defendants, ... may be such as not to justify an award of exemplary damages.” 368 S.W.2d at 584 (emphasis added). The Texas Court of Civil Appeals has also declared, in considering those cases allowing an award of exemplary damages in suits for equitable relief, that “the rule is that a litigant may recover exemplary damages in actions for equitable relief, but in order to do so, there must be some actual loss or injury to support such recovery.” Adam v. Harris, supra, 564 S.W.2d at 156. See also Teas v. Republic National Bank of Dallas, 460 S.W.2d 233, 244 (Tex.Civ.App. —Dallas 1970, writ ref’d n.r.e.).
Accordingly, many Texas appellate decisions have held that a plaintiff, though properly recovering equitable or similar relief, is nevertheless not entitled to exemplary damages where he has not shown that he in fact sustained actual loss or injury. Thus, in City Products Corp. v. Berman, 610 S.W.2d 446 (Tex.1980), the plaintiff tenant was held entitled to an injunction against his landlord and a competing tenant because the latter’s lease from the landlord constituted a willful violation of the prohibited competition clause of the plaintiff’s lease. Nevertheless, the Texas Supreme Court held that, it not having been found that the plaintiff sustained ac *1364 tual damage, exemplary damages could not be recovered, since for such recovery “the complainant must prove that he suffered some actual damages.” Id. at 450. Other cases to like effect are cited in the margin.[26]
Texas cases that have allowed recovery of exemplary damages in equitable actions all seem to be ones where either the plaintiff also either has been properly awarded an actual monetary judgment (apart from the exemplary damages) against the defendant or has otherwise proved that he in fact suffered actual loss or injury. See Holloway, supra (judgment for amount of profits received and withheld in breach of fiduciary duty); Russell v. Truitt, 554 S.W.2d 948, 955 (Tex.Civ.App. — Fort Worth 1977, writ refd n.r.e.) (judgment for amount of agency fees received and withheld in breach of fiduciary duty); Nolan v. Bettis, 577 S.W.2d 551, 554-55 (Tex.Civ.App. — Austin 1979, writ refd n.r.e.) (damages for actual loss of use of land resulting from accomplished foreclosure).[27]
Applying these cases to the present facts, we hold that the Trustee is not entitled to recover exemplary damages from Equico. The Trustee has not demonstrated that Dairyland’s general creditors, which it represents, have experienced any actual harm as a result of the occurrences giving rise to the Trustee’s single substantive claim against Equico which we have sustained. Cf. Stonecipher. The Trustee’s only valid substantive claim against Equico is for the $150,193 which it did not apply to Dairyland’s secured debt to it. Had Equico applied these sums as it should have, nevertheless there would at all times have remained a significant secured debt owing from Dairyland to Equico. The potential harm to Dairyland’s creditors would have been actually realized only if Equico had foreclosed or had received fraudulently transferred sums in excess of Dairyland’s outstanding debt to it. It is true that the Trustee had to resort to court proceedings to prevent actual damage from occurring and to establish the credit to which Dairy-land was entitled. But the same sort of situation was present in City Products Corp. v. Berman, supra, where an injunction was necessary to prevent harmful competition, and is likewise present in, for example, any action to remove cloud from title or to reform a deed. See note 26, supra. As long as the plaintiff has not in fact suffered actual harm or loss, the mere need to judicially “correct” the “record” or the “books” or the like so that actual harm will not occur does not suffice.
For these reasons we set aside the Trustee’s recovery of exemplary damages against Equico.
V.
THE $18,425 REIMBURSEMENT TO THE TRUSTEE
Equico asserts that the $18,425 adjustment allowed the Trustee for sums it had *1365 paid Equico since bankruptcy in respect to the Dairyland debt to Equico (see note 3, supra and accompanying text) is unsupported by the evidence. With one. minor exception, we reject this contention. Equico’s own answer establishes this $18,425 amount. Equico asserts its answer cannot be considered because it was not introduced in evidence. While this argument would have some merit had the answer been a superseded pleading, see Borel v. United States Casualty Co., 233 F.2d 385 (5th Cir.1956), it was, on the contrary, Equico’s current pleading and hence did not have to be put in evidence in order to be considered against Equico. Sinclair Refining Co. v. Tompkins, 117 F.2d 596, 598 (5th Cir.1941). See also Scott v. Commissioner, 117 F.2d 36, 40 (8th Cir.1941); 4 Wigmore, Evidence § 1064 at 67 (Chadbourn rev. 1972); McCormick on Evidence § 265 at 633 (E. Cleary ed. 1972). The adjustments in question were apparently made by the trial court for the wholly proper purpose of preventing Equico from getting “double” credit for the secured debt owed it by Dairyland, i.e., both getting a credit or setoff on account of that debt and also getting paid it. However, the portion of the $18,425 adjustment represented by the $4,250 payment to Equico on the “bailer-head cutter” debt relates to a debt not included in the $273,361.16 secured debt allowed by the trial court as an offset. Hence the $18,425 adjustment should have been $14,175. We sustain Equico's point to this extent only, and in all other respects overrule it.[28]
YI.
DISPOSITION OF TRUSTEE’S CLAIMS AGAINST EQUICO
We have set aside the Trustee’s award of exemplary damages against Equico, and all its substantive claims against Equico except that for the $150,193 which Equico received from the proceeds of the Dairy-land cows mortgaged to it and did not apply to the Dairyland debt. As noted, the trial court applied the amount of the Trustee’s substantive recovery against Equico first to the reduction of Dairyland’s debt to Equico secured by its lien on the ranch. This extinguished the debt so secured, and the trial court cancelled Equico’s lien on the ranch and its sales proceeds and declared, in effect, that Brazos’ lien thereon was superior to that of all parties/ Our reduction of the Trustee’s claim against Equico to $150,193, however, changes the results of the procedure employed by the trial court and leaves something in the neighborhood of $100,000 still owing on the Dairyland debt to Equico secured by the latter’s lien on the ranch. Therefore, following the same procedure would require the trial court’s judgment to be modified so as to reduce the Dairyland debt to Equico only by the referenced $150,193 and to correspondingly reduce the amount secured by Equico’s lien on the ranch proceeds, rather than wholly cancelling such lien.[29] We remand the Trustee’s suit against Equico for entry of proper judgment consistent with the foregoing and for any further *1366 proceedings appropriate in that connection as are not inconsistent herewith.[30]
VII.
THE UNSECURED CLAIM OF NEWTON AND MESKER AGAINST THE TRUSTEE
Newton and Mesker argue that the trial court should have offset Dairyland’s recovery against them by the $280,738 which the jury found had been advanced to Dairyland by Newton and Mesker or Dairy Cows during the period from May 20, 1972 to December 23, 1975. We disagree for several reasons.
First, the jury finding was not a finding of the debt owed by Dairyland to Newton, Mesker, or Dairy Cows. No finding was made as to whether any of the sums advanced were repaid. Newton and Mesker have therefore failed to establish a claim against the Trustee.
Second, the evidence shows that any debt that Dairyland owed to Newton, Mesker, or Dairy Cows was wholly unsecured. It would defeat the purpose of the Bankruptcy Act’s provisions relating to fraudulent transfers to allow Newton and Mesker to offset the value of the property thus transferred to them by the amount of their unsecured claim against Dairyland. With reference to preferential transfers this Court has previously declared in Walker v. Wilkinson, 296 F. 850 (5th Cir.1924):
“The reason is, to permit this to be done would defeat the right to recover the preference and render the statute futile. In such a case the transaction is single, and results in a depletion of the fund that would otherwise have gone to creditors to the extent of the preferential payment. Allowing the creditor to set off the debt due him against the payments received by him would leave the preference unremedied. In this class of cases, the right to offset is denied, because the estate has been depleted to the detriment of creditors of like class, and to allow the right of set off would perpetuate the depletion.”
This reasoning is at least equally applicable to fraudulent transfers. Moreover, section 57(g) of the Bankruptcy Act, 11 U.S.C. § 93(g) (1976), would likewise appear to bar any such set off. See Katchen v. Landy, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966).
We affirm all the Trustee’s recovery against Newton and Mesker except only that respecting the some 275 Dairyland cattle sold at auction, the $64,465 proceeds of which sales were' paid to Dairyland and used by it in its operations. We reverse the case as against Newton and Mesker and remand for the entry of judgment consistent herewith and for any further proceedings as may be appropriate in that connection and not inconsistent herewith.[31]
VIII.
THE AWARD OF EXEMPLARY DAMAGES TO BRAZOS AGAINST EQUICO
Equico challenges that award against it and in favor of Brazos of exem *1367 plary damages, on the ground that no actual damage to Brazos, in respect to any matter involving Equico, was proved or found by either the trial court or the jury. We sustain this contention.
We recognize that Brazos, as a junior lienholder, has standing to complain of, and recover any actual damages in fact occasioned by, Equico’s misapplication of the $150,193. Cf. Stonecipher. However, this does not take Brazos out of the rule, discussed in part IV above in connection with our denial of the Trustee’s claim against Equico for exemplary damages under the Texas fraudulent conveyance statute, that exemplary damages are not available unless the plaintiff has in fact sustained actual loss or injury. None such has been or will be suffered by Brazos. There has been no foreclosure by Equico; Brazos’ lien has not been extinguished; Brazos has not paid, or been denied possession of, anything to which it was entitled.[32] Moreover, the trial court’s judgment has protected and will protect Brazos’ lien on the ranch sales proceeds from being inferior to that portion of the original Dairyland debt to Equico which should have been, but was not, credited with the $150,193 Equico received from the proceeds of the 188 Dairy-land cattle mortgaged to it. This, it seems to us, is analogous to the protection, and prevention of the suffering of actual loss or injury, resulting from the injunction and declaratory relief in City Products Corp. v. Berman, supra, or from an order removing a cloud on title or the like. See note 26, supra.
The injury to junior lienholder Brazos from Equico’s failure to apply the $150,193 to the debt secured by Equico’s superior lien was only potential. No actual loss or injury ever resulted. Brazos therefore may not recover exemplary damages from Equico, and we reverse so much of the judgment as so provides. This part of the case will also be included in our remand for the entry of appropriate judgment consistent herewith.
IX.
THE USURY ISSUE
By agreement, the parties submitted separately to the trial court the Trustee’s usury claim against Equico. In its Memorandum Opinion and Order, the trial court found that Equico had advanced $200,000 to Dairyland, for which Dairyland had executed in May 1972 a promissory note to Equico for $296,600 payable in eighty-four equal monthly installments. The face amount of the note represented $200,000 in principal with $96,600 as “add on interest” calculated at a rate of twelve percent per annum over eighty-four months. The note was secured by deeds of trust on the ranch and equipment owned by Dairyland.[33] The note contained the following printed acceleration clause:
“It is expressly provided that upon, default in the punctual payment of this note or any part thereof, principal or interest, as the same shall become due and payable, or upon failure to comply with any of the covenants, terms or conditions of any deed of trust or other lien *1368 securing the payment of this note, the entire indebtedness secured by the hereinafter mentioned lien shall be matured, at the option of the holder____”
The deeds of trust each contained the following printed provision:
“That in any of the following events [of default] the Beneficiary may elect to declare the entire indebtedness hereby secured, with all interest and all other sums hereby secured, immediately due and payable,____”
The trial court ruled that the applicable maximum lawful rate of interest was the eighteen percent per annum provided for corporations, their successors, assigns, and guarantors by article 1302-2.09, Tex.Rev.Civ.Stat.Ann. (Vernon 1980), and that at no time did Equico receive or collect interest at a greater rate than this maximum. The trial court likewise determined that if the note had been paid off according to its specified installment schedule, no interest in excess of this maximum rate would have been paid or received. None of these determinations are in any way challenged.
The Trustee, however, bases its claim of usury on two theories. First, it claims that the note, read in connection with the deeds of trust, is usurious on its face because it constitutes a contract for usurious interest [34] in that it allows the noteholder, in the event the maker defaults in the payment of any of the installments, to accelerate the maturity of the entire note and collect the full amount (including the then unearned portion) of the “add on” interest included in the face amount of the note. It is not disputed that if the Trustee’s construction of the note is correct then it is indeed usurious on the basis urged. Smart v. Tower Land and Investment Co., 597 S.W.2d 333 (Tex.1980). The trial court, however, rejected this construction of the note. For the reasons stated below, we are in agreement with the trial court.
The second basis of the Trustee’s usury claim is that Equico in fact charged usurious interest by statements made by its officer Lantz in a May 30, 1975 telephone conversation with Roberts, after Dairyland had defaulted on its note payments, and by Lantz’s June 6,1975 handwritten memorandum of this conversation which was placed in Equico’s file on this note. The Trustee asserts in this connection that a demand for payment is a charge and that Lantz in substance demanded full payment of the note, including all the unearned interest. Again, it is not disputed that if such a demand were made, Equico would be guilty of usury. The .trial court, however, found that no such demand was made and that Equico did not on the referenced occasions make any charge of the unearned interest. For the reasons stated below, we determine that the trial court’s findings in this respect are not clearly erroneous and we sustain its ruling.
We first consider whether the acceleration clauses in the note and deeds of trust rendered the transaction usurious on its face. The rule enunciated in Walker v. Temple Trust Co., 124 Tex. 575, 80 S.W.2d 935, 936-37 (Comm.App.1935) (opinion adopted), is applicable to the facts of this case:
“It is presumed that in contracting parties intend to observe and obey the law. For this reason the court will not hold a contract to be in violation of the usury laws unless, upon a fair and reasonable interpretation of all its terms, it is manifest that the intention was to exact more interest than allowed by law____
“[U]nless the contract by its express and positive terms evidences an intention which requires a construction that unearned interest was to be collected in all events, the court will give it the construction that the parties intended that the unearned interest should not be collected.”
*1369 Texas courts interpreting notes or deeds of trust involving acceleration clauses using words equivalent to “entire indebtedness” have found that these clauses did not authorize collection of unearned interest. See, e.g., Clements v. Williams, 136 Tex. 97, 147 S.W.2d 769 (1941) (maturity of “debt” indicates unearned interest not collectible); Davis v. Volunteer State Life Insurance Co., 135 S.W.2d 588 (Tex.Civ.App.—Texarkana 1939, writ ref'd) (acceleration of “all sums herein agreed to be paid” does not call for the collection of unearned interest); Southland Life Insurance Co. v. Egan, 126 Tex. 160, 86 S.W.2d 722, 724 (1935) (acceleration of “whole debt herein secured” does not provide for the collection of unearned interest); Marble Savings Bank v. Davis, 124 Tex. 560, 80 S.W.2d 298, 299 (1935) (acceleration of “the whole of the indebtedness” does not provide for collection of unearned interest); Belzung v. Capital Bank, 598 S.W.2d 14, 15 (Tex.Civ.App.—Dallas 1980, writ ref’d n.r.e.) (acceleration of “the indebtedness secured hereby” does not include unearned interest). See also Jim Walter Homes, Inc. v. Schuenemann, 668 S.W.2d 324, 328 (Tex.1984) (“A provision which states that a ‘debt’ may be matured does not call for the collection of unearned interest, because interest does not become part of the ‘debt’ until it is earned.”). Under these authorities, it is clear that the acceleration clause in the note, providing only for the acceleration of “the entire indebtedness,” did not authorize the collection of unearned interest and did not render the note usurious. We hold that the note on its face was not usurious.
The Trustee, however, points to the acceleration clause in the deeds of trust, each speaking of “the entire indebtedness hereby secured, with all interest and all other sums hereby secured” (emphasis added). The Trustee relies on Clements v. Williams, supra, which held that a clause authorizing acceleration of the “note” provided for the collection of the unearned interest which was included in the face amount of the note. The decision in Jim Walter Homes, Inc. is to the same effect. In the deed of trust clause here, however, there is no statement that the “note” will be matured. The phrase “with all interest” can very well be taken to mean all earned interest.[35] See Shropshire v. Commerce Farm Credit Co., 120 Tex. 400, 39 S.W.2d 11, 12, cert. denied, 284 U.S. 675, 52 S.Ct. 130, 76 L.Ed. 571 (1931) (“If the contract ... contained no language other than that, if default was made ... the principal of the note, ‘with interest,’ should be collectible ... such language would be fairly susceptible of the meaning that unearned interest was to be abated.”); Belzung at 16. Nevertheless, we do not determine whether this deed of trust clause, if it stood alone, would authorize the collection of unearned interest. It does not stand alone.
To begin with, the deed of trust acceleration clause must be read in connection with the note, particularly as each refers to the other. See e.g., Walker v. Temple Trust Co., supra, 80 S.W.2d at 936; Nevels v. Harris, 129 Tex. 190, 102 S.W.2d 1046 (1937). See also Jones v. Kelly, 614 S.W.2d 95, 98 (Tex.1981); Miles v. Martin, 159 Tex. 336, 321 S.W.2d 62, 65 (1959); Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472, 475 (1942); Spanish Village, Ltd. v. American Mortgage Co., 586 S.W.2d 195, 199-200 (Tex.Civ.App.—Tyler 1979, writ ref’d n.r.e.). We are thus faced with two applicable acceleration clauses; one in the note providing for the acceleration of “the entire indebtedness,” which does not authorize the collection of unearned interest and is not usurious; and *1370 one in the deeds of trust which arguably authorizes the collection of unearned interest so as to be usurious. Our case is thus analogous to Belzung, where the note contained two acceleration clauses: one which, similarly to that in the note here, related to “the indebtedness secured hereby” and hence did not authorize the collection of unearned interest and was not usurious; and the other which authorized collection of “the whole of this note” on acceleration, and hence was clearly usurious. The Bel-zung court held that in this situation the “legal” clause must prevail over the illegal clause, and accordingly ruled that the note was not usurious! Id. at 15-16. Belzung controls here.
Indeed, the present case is a stronger one for the nonusurious nature of the instruments than Belzung, in at least three respects. First, in Belzung one of the clauses, standing alone, was clearly usurious. As we have noted, the deed of trust acceleration clause here is, if usurious, certainly much less clearly so than the “whole of this note” clause in Belzung. Second, in Belzung both clauses were in the note, while here the acceleration clause in the note is plainly not usurious, while the questionable clause is in the deeds of trust. This circumstance brings into operation the statement in Walker v. Temple Trust Co., supra, that it is preferable to look to the note rather than to “the acceleration clause contained in the instrument [the deed of trust], which is intended primarily to furnish security rather than create an additional obligation of liability.” Id. 80 S.W.2d at 937. Finally, in Belzung the deed of trust apparently did not contain a usury savings clause. Each of the deeds of trust here do, as more fully discussed below.
We do not regard the Supreme Court’s decision in Jim Walter Homes, Inc. as in any way undermining Belzung. In Jim Walter Homes, Inc. the Court considered a building contract, a note, and the mechanic’s lien contract which secured the note, all executed at the same time and in reference to the same transaction. The note was an installment note with “add on” interest included in its face amount. The note and mechanic’s lien contract each contained acceleration clauses authorizing collection of the entire “note,” and were thus held to be usurious under Clements v. Williams, supra. The creditor, however, pointed to the provision in the building contract which stated that the note and mechanic’s lien contract “shall provide” that on default in any installment the creditor may declare “all of the remainder of said debt immediately due.” Relying on Belzung, it was argued that this building contract clause was not usurious and should govern over the usurious clauses in the note and mechanic’s lien contract. The Texas Supreme Court did not dispute that the building contract was not usurious, but declined to allow it to prevail over the usurious clauses in the note and mechanic’s lien contract. In so holding, however, it did not question Belzung, but rather distinguished it, observing that “Belzung differs from this case in two significant ways.” 668 S.W.2d at 331. The first difference was that in Belzung the nonusurious acceleration provision “was an actual, operative agreement” in contrast to “the nonusurious language in the building contract [which] is merely an inaccurate description of the acceleration terms actually agreed upon by the parties.” Id. In the present case the nonusurious acceleration language in the note is “an actual, operative agreement,” and is not a description of another agreement. “Second, the note involved in the Belzung case showed on its face that part of the payments required by the note were for interest,” while the note in Jim Walter Homes, Inc. gave “no indication whatever” that it included any interest, which was described as “a crucial difference.” Id. Here, of course, the note, both on its face and as described in the deeds of trust, specifically states that its face amount includes interest. See note 32, supra. Accordingly, we regard Belzung as representing the law of Texas and as requiring us to hold that the note and deeds of trust here are not facially usurious..
*1371 This conclusion is reinforced by the presence in each deed of trust of a printed usury savings clause reading as follows:
“Nothing herein or in said Note shall ever entitle the Beneficiary, upon the arising of any contingency whatsoever, to receive or collect interest in excess of 10% per annum on the principal indebtedness hereby secured and in no event shall Grantors be obligated to pay interest thereon in excess of such rate.”
In the face of this clause in the deeds of trust, it would indeed be anomalous to allow another clause (also printed) in the same instruments to overcome the nonusu-rious acceleration provision of the note.
Texas courts have repeatedly given effect to usury savings clauses to defeat a construction of a contract that would violate state usury laws. See, e.g., Nevels v. Harris, 129 Tex. 190, 102 S.W.2d 1046 (1937); Tanner Development Co. v. Ferguson, 561 S.W.2d 777 (Tex.1977); Spanish Village, Ltd. v. American Mortgage Co., 586 S.W.2d 195 (Tex.Civ.App.—Tyler 1979, writ ref’d n.r.e.). See also Rickman v. Modern American Mortgage Corp., 583 F.2d 155 (5th Cir.1978), cert. denied, 441 U.S. 962, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979); Imperial Corp. of America v. Frenchman’s Creek Corp., 453 F.2d 1338 (5th Cir.1972).
We recognize that the mere presence of a usury savings clause will not rescue a transaction that is necessarily usurious by its explicit terms, see Nevels, supra, 102 S.W.2d at 1050, but this is not such a case. The savings clause reinforces our conclusion that the note and the deeds of trust are not facially usurious.[36]
We turn now to the Trustee’s claim that Equieo charged usurious interest by means of Lantz’s May 30, 1975 conversation with Roberts. Dairyland had been in default on. the note since April 1975. Roberts, in mid-May 1975, wrote Equieo requesting a pay-off figure on the note. The Lantz-Roberts telephone conversation resulted. Lantz testified that he got from “the computer run” the figures for the Dairyland “account balances” and gave them to Roberts on the telephone. These figures for “account balances” included the unearned interest. However, Lantz also testified that he “explained to him [Roberts] these were account balances,” as distinguished from pay-off figures. Lantz replied “Yes” when asked, “Did you explain to him' what you were giving to him was the balance, and not the pay-off figure.” On June 6, 1975 Lantz made a handwritten memorandum to the Equieo file noting the figures he had given Roberts as “balances •on Dairyland.” The memorandum does not purport to show a pay-off figure. The trial court found, with ample support in the evidence, that:
“On at least five occasions following Dairyland’s default in April 1975, defendant Equieo calculated the amount of unearned interest to be refunded in the event of foreclosure of its various notes with Dairyland. Equieo computed the net pay-off balance on the land note to be $145,581.14 as of the date of default____ Equieo computed the balance to be $151,-968.00 as of May 1975____ These fig *1372 ures were updated on three subsequent occasions____ At all times in the bankruptcy proceeding, Equico took the position that Dairyland was indebted to it in an amount in excess of $300,000.00 which is consistent with a claim for the sum of the net pay-off figures of all Dairyland notes after reduction for unearned interest.”
The trial court likewise found (and it is not disputed) that each of these net pay-off figures calculated by Equico reflected a rate of interest not in excess of the eighteen percent legal maximum.
We conclude that the trial court’s implied finding that the May 30 conversation did not constitute a charging or demand for payment of the account balances, which included all the interest, and its finding that the June 6 file memorandum did not constitute such a demand for payment, or such a charging, are not clearly erroneous. We therefore sustain the trial court’s determination that Equico did not charge usurious interest.
Accordingly, we reject the Trustee’s appeal for the denial of its usury claim, and sustain the trial court’s rejection of that claim.
X.
CONCLUSION
We hold that the Trustee is not entitled to recover exemplary damages from Equi-co, and is not entitled to recover on any of its substantive claims against Equico except for its fraudulent conveyance claim, under the Bankruptcy Act and the Texas statute, respecting the $150,193 which Equico received on the 188 Dairyland cattle mortgaged to it and did not apply to the Dairyland debt. Except to hold that the sum should be $14,175 instead of $18,425 as determined by the trial court, we reject Equico’s complaints as to the $18,425 which the trial court allowed the Trustee. We hold that the Trustee is not entitled to recover on its usury claim against Equico, and sustain the trial court’s ruling in this respect. We further hold that .Brazos is not entitled to recover exemplary damages from Equico. We set aside the trial court’s judgment cancelling Equico’s lien on the ranch and its proceeds and declaring that Brazos’ lien is superior to that of all parties except the ranch purchaser, but hold that Equico’s lien is reduced by the referenced $150,193. We reject all of Equico’s other complaints on appeal. Respecting Newton and Mesker’s complaints on appeal as to the Trustee’s recovery against them, we sustain only the assertion that the Trustee may not recover in regard to the some 275 Dairyland cattle sold at auction for $64,465 cash paid to Dairyland and used by it in its operations. We set aside the Trustee’s recovery against Newton and Mesker of such $64,465; otherwise we make no modification in the Trustee’s recovery from Newton and Mesker. Our holdings respecting the Trustee’s recovery from Equico and Newton and Mesker will require other modifications in the judgment (see notes 28, 29, and 81, and accompanying text, supra). Newton and Mesker do not complain of Brazos’' recovery against them, and hence we do not disturb the holdings below in that respect.
The case is accordingly reversed and remanded to the trial court for the entry of judgment in conformity with our holdings herein and for any further proceedings as may be appropriate in that connection and not inconsistent herewith.

. Some nineteen special interrogatories were submitted, several having two or more separate subparts. What we have set out is, we believe, a fair summary, paraphrasing and combining the relevant interrogatories and answers.

. Actually, the trial court, due to a $10 computational error, used a gross figure of $318,406, instead of $318,416, but this was cancelled out when an offsetting $10 error was made in subtracting the $273,361.16, so that the $45,054.84 net was in any event correct.
The referenced $273,361.16 which the trial court found Dairyland owed Equico as of May 1975 was apparently comprised of the following items: $152,604 ranch acquisition debt; $27,-261.79 equipment lease debt; and, $93,495.37 cow lease debt.

. This $18,425 consisted of: $7,425 ranch acquisition debt; $6,750 equipment lease debt; and, $4,250 on a bailer-head cutter.

. There was some testimony at trial that the remaining proceeds were also reduced by approximately $30,000 for commissions on the sale of the ranch.

. Newton and Mesker are represented by the same counsel as Equico, and, other than adopting Equico’s brief, raise only one contention, namely, that they are entitled to a credit for the $280,738 the jury found they had advanced to Dairyland (jury finding 19). Equico's brief raises no question whatever about any of the exemplary damages awarded against Newton and Mesker nor about the actual damages awarded Brazos against Newton and Mesker, and for the most part its other contentions relate solely to its own special situation as a lender to and secured creditor of Dairyland, rather than to legal or factual theories commonly applicable to both it and Newton and Mesker. Consequently, respecting the defendants’ appeals our analysis will primarily focus on Equico.

. This amount was then reduced by the amount of Dairyland’s debt to Equico to produce the net actual damage award.

. However, the jury did find that Equico, Newton, and Mesker also conspired to cause Dairy-land to cease doing business as an ongoing concern "on January 31, 1975” with "actual intent to hinder, delay or defraud existing or future creditors” of Dairyland (finding 3), and that Equico knew or should have known Dairy-land was insolvent on December 4, 1974 (findings 1 & 2). The jury also found Equico had failed to act with ordinary care respecting the Dairyland cows mortgaged to it (finding 7).

. Further, the jury found that Newton and Mesker (not Equico) "on and after January 31, 1975” caused Dairyland to transfer cattle (of unspecified value and number) owned by it to Dairy Cows "without fair consideration” and "with actual intent to hinder, delay or defraud existing or future creditors” of Dairyland (findings 4 & 5).
*1352 The undisputed evidence is that all transfers from Dairyland to Dairy Cows on or after January 31, 1975 were made in consideration of the cancellation of Dairyland's preexisting indebtedness to Dairy Cows, and that at the time (on or •after January 31, 1975) Newton and Mesker were the sole owners and principals of both Dairyland and Dairy Cows. The jury also found that from the May 1972 formation of Dairyland to December 1975, when it went in bankruptcy, Newton and Mesker had advanced $280,738 to Dairyland (finding 19). The jury did find that Equico on December 4, 1974 first knew that Dairyland "had transferred any” of its cows to Dairy Cows (finding 6), but there was no finding of want of fair consideration or improper purpose in respect to any pre-January 31, 1975 transfers.

. We reject appellants’ claims that the evidence is insufficient to support the $103,000 and $64,-692 figures found by the jury in this respect.

. The events at issue took place prior to the enactment of the Bankruptcy Code, and as the parties have assumed the applicability of the Bankruptcy Act, rather than the Code, we deal only with the Act.

. See also P & T Manufacturing Co. v. Exchange Savings & Loan Ass'n, 633 S.W.2d 332 (Tex.App. — Dallas 1982, writ ref’d n.r.e.) (holders of valid mechanic’s lien who had not foreclosed could not sue for conversion as they were not owners and did not have legal right to possession); Christian v. First National Bank of Weatherford, 531 S.W.2d 832, 841 (Tex.Civ.App. —Fort Worth 1975, writ ref’d n.r.e.) (“A conversion can take place even when the person in possession does not have title to the property so long as he has the right of immediate possession.”); O’Connor v. Fred M. Manning, Inc., 255 S.W.2d 277, 278 (Tex.Civ.App. — Eastland 1953, writ ref’d) ("... to maintain an action for conversion it is necessary ... that he had, at the time of the alleged conversion, acquired some right or title to the identical goods or chattels claimed to have been converted.”).

. See also Houston National Bank v. Biber, 613 S.W.2d 771, 774 (Tex.Civ.App. — Houston [14th Dist.] 1981, writ refd n.r.e.) (“An action for conversion will not lie for money represented by a general debt.’’).

. While section 70a(4), 11 U.S.C. § 110a(4) (1976), includes, as property, the title of the bankrupt to which is vested in the trustee as of the date of bankruptcy, “property transferred by him [the debtor] in fraud of his creditors," this "merely indicates the trustee’s right to act under the applicable provisions of the statute [sections 67d and 70e] for the benefit of the estate" and does not otherwise enlarge the trustee's power. 1 Collier Bankruptcy Manual § 70.10 (2d ed. 1978) (footnote omitted).
Nor do sections 67 or 70e of the Bankruptcy Act, 11 U.S.C. §§ 107 & 110e (1976), provide a basis for a conversion action by the Trustee, as they deal with transfers made with consent of the bankrupt. Park v. Cameron, 237 U.S. 616, 618, 35 S.Ct. 719, 720, 59 L.Ed. 1147 (1915); Jackson v. Star Sprinkler Corp., 575 F.2d 1223, 1229 (8th Cir.1978) (distinguishing Schainman v. Dean, 24 F.2d 475 (9th Cir.), cert. denied, 278 U.S. 598, 49 S.Ct. 7, 73 L.Ed. 527 (1928)); Siegel v. Municipal Capital Corp., 102 F.2d 905, 907 (2d Cir.1939). This, of course, does not mean that sections 67 or 70e are inapplicable here. We consider their applicability below. The point is not that they are inapplicable (indeed we hold they are applicable, in part), but rather that they do not give the Trustee an action for conversion as such.
Though the same reasoning would seem to apply to section 60 of the Bankruptcy Act, 11 U.S.C. § 96 (1976), it is in any event not involved here as none of the challenged transfers was made within four months of the date of bankruptcy.

. Section 67d(3) likewise describes as fraudulent certain transfers made by a debtor within four months prior to the filing of a petition initiating a proceeding under the Bankruptcy Act by or against the debtor. This provision, however, is inapplicable since all the transfers at issue here were made more than four months prior to December 23, 1975, when bankruptcy proceedings were instituted against Dairyland.

. Section 67d(6) provides in part:
“(6) A transfer made or an obligation incurred by a debtor adjudged a bankrupt under this title, which is fraudulent under this subdivision against creditors of such debtor having claims provable under this title, shall
be null and void against the trustee ____’’
Section 70e provides in part:
"(e)(1) A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor.
“(2) All property of the debtor affected by any such transfer shall be and remain a part of his assets and estate, discharged and released from such transfer and shall pass to, and every such transfer or obligation shall be avoided by, the trustee for the benefit of the estate: Provided, however, That the court may on due notice order such transfer or obligation to be preserved for the benefit of the estate and in such event the trustee shall succeed to and may enforce the rights of such transferee or obligee. The trustee shall reclaim and recover such property or collect its value from and avoid such transfer or obligation against whoever may hold or have received it, except a person as to whom the transfer or obligation specified in paragraph (1) of this subdivision is valid under applicable Federal or State laws.”

. The Elliott opinion specifically refers to the following:
"Subparagraph 6 of section 67(d) provides that a transfer which is fraudulent under that section shall be ‘null and void against the *1358 trustee * * Section 70(e)(2) states in addition that, if a transfer of property is fraudulent or voidable under any applicable federal or state law, the trustee ‘shall reclaim and recover such property or collect its value from and avoid such transfer * * * against whoever may hold or have received it * * (Emphasis added.) And under section 60(b), a preference may in certain circumstances “be avoided by the trustee — in which case he 'may recover the property or, if it has been converted, its value from any person who has received or converted such property * * (Emphasis added.)" Id.

. The Elliott opinion continues by pointing out that many transfers which are "fraudulent” under the Bankruptcy Act do not involve actual fraud, so that a rule holding all participants fully liable, including those who received none of the proceeds, would be unjust in many instances. Id. Nevertheless, it specifically rejects any "construction of the sections in question [sections 60, 67 and 70] which would allow recovery against a nonrecipient only when actual fraud is proved, or only when recovery of the property or its value from the recipients is not possible," noting that such a construction would be "an ad hoc device too tortured and particular in nature to merit acceptance." Id. at 516 n. 2. The opinion recognizes that the recipients may be liable for the value of the property, if, for example, they have disposed of it so that recovery in specie is no longer possible. Id. at 517. It likewise acknowledges that "state law may well — where actual fraud was engaged in — allow a damage action in the nature of deceit against any conspirators.” Id.

. As previously observed, these cattle form a part of the cattle worth $280,108 inquired about in interrogatories 8 and 9, neither of which inquire about such intent or consideration; nor do interrogatories 14 and 15 (respecting the $150,193) or any other interrogatories respecting these transactions. The same is also true concerning the findings (numbers 12 & 13) which relate to the Misco "assumption” cattle in which Dairyland had the $38,308 "equity.”

. We note in this connection that the case was apparently tried below at least in part on a fraudulent conveyance theory, that the jury did find that Equico, Newton, and Mesker, with actual intent to hinder, delay, or defraud creditors, conspired to cause Dairyland to cease doing business as an ongoing concern on January 31, 1975, and that the jury further found that Newton and Mesker (but not Equico), with actual intent to hinder, delay, or defraud creditors, caused Dairyland to transfer cows it owned (of unspecified number and value) to Dairy Cows without fair consideration.

. The jury did find that Equico received $150,-193 proceeds from Dairyland cattle which it did not apply to Dairyland’s debt.

. We also observe that there is no finding nor any evidence of the value or extent of any such incidental benefit any of the defendants may have received from the auction sales of these cows. Indeed, there is no finding that they benefited in any way therefrom.

. Tex.Bus. & Com.Code Ann. § 24.02 (Vernon 1968):
"(a) A transfer of real or personal property ... is void with respect to a creditor, purchaser, or other interested person if the transfer ... was intended to
"(1) delay or hinder any creditor, purchaser, or other interested person from obtaining that to which he is, or may become, entitled; or
"(2) defraud any creditor, purchaser or other interested person of that to which he is, or may become, entitled.
"(b) The title of a purchaser for value is not void under Subsection (a) of this section unless he purchased with notice of
"(1) the intent of his transferor to delay, hinder, or defraud; or
"(2) the fraud that voided the title of his transferor.”
See also id. § 24.03:
"(a) A transfer by a debtor is void with respect to an existing creditor of the debtor if the transfer is not made for fair consideration, unless, in addition to the property transferred, the debtor has at the time of transfer enough property in this state subject to execution to pay all of his existing debts.
"(b) Subsection (a) of this section does not void a transfer with respect to a subsequent creditor of or purchaser from the debtor."

. Tex.Bus. & Com.Code Ann. § 6.104 (Vernon 1968).

. The Texas Supreme Court has declared that "a creditor, though he have no specific lien, may maintain an action in equity to vacate a fraudulent conveyance of his debtor’s land." Eckert v. Wendel, 120 Tex. 618, 40 S.W.2d 796, 797 (1931). See also Hollins v. Rapid Transit Lines, Inc., 440 S.W.2d 57 (Tex.1969) (tort claimant not required to obtain judgment before bringing an action under fraudulent conveyance statute).

. We note that this case was not tried, nor is the judgment based, on a theory of actual fraud. While the interrogatories concerning Newton, Mesker, and Equico causing Dairyland to cease doing business as an ongoing concern on January 31, 1975 (number 3), and Newton and Mesker on and after January 31, 1975 transferring Dairyland cattle (of unspecified number and value) to Dairy Cows without fair consideration (numbers 4 & 5), do refer to "actual intent to hinder, delay or defraud" creditors, such language merely tracks the statutory definition of a fraudulent conveyance under section 67d(2)(d) of the Bankruptcy Act and (except for "defraud") the Texas fraudulent conveyance statute. But an action for fraudulent conveyance is distinct from an action for fraud. Nobles v. Marcus, 533 S.W.2d 923, 925 (Tex.1976); Elliott, 390 F.2d at 517. Further, the judgment is not based on these findings. Moreover, recovery cannot be based on common-law fraud because there is no evidence or finding of detrimental reliance by creditors or the damage occasioned thereby. See generally Chemetron Corp. v. Business Funds, Inc., 682 F.2d 1149, 1171-72 (5th Cir.1982), vacated and remanded on other grounds, 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983), rehearing en banc granted following remand, 718 F.2d 725, 730 (5th Cir.1983); Custom Leasing, Inc. v. Texas Bank & Trust Co. of Dallas, 516 S.W.2d 138, 143 (Tex.1974); Sawyer v. Pierce, 580 S.W.2d 117, 124 (Tex.Civ.App. — Corpus Christi 1979, writ ref'd n.r.e.); Yarborough v. Back, 561 S.W.2d 593, 595 (Tex.Civ.App.— Amarillo 1978, no writ).

. See National Bank of Commerce v. May, supra at 691-92 (declaration that deed void as to portion altered so as to wrongfully include plaintiff’s land); Adam v. Harris, supra at 156 (recission of trust agreement, execution of which was procured by fraud); Bibby v. Preston, supra at 903 (removal of cloud on title); Phillips v. Wertz, 546 S.W.2d 902, 907-09 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.) (title, trespass, and injunction); Securities Investment Co. v. Finance Acceptance Corp., 474 S.W.2d 261, 270 (Tex.Civ.App.—Houston [1st Dist.] 1971, writ refd n.r.e.) (conversion); Texas Electric Service Co. v. Linebery, 333 S.W.2d 596, 599-600 (Tex.Civ.App.—El Paso 1960, no writ) (trespass and construction of easement). See also Bell v. Ott, 606 S.W.2d 942, 954 (Tex.Civ.App.—Waco 1980, writ refd n.r.e.); Cherry v. Turner, 560 S.W.2d 794, 795-96 (Tex.Civ.App.—Austin 1978, writ ref'd n.r.e.).

. The only decision we have found which is arguably a departure from this pattern is Fillion v. Troy, 656 S.W.2d 912, 914-15 (Tex.Civ.App.—Houston [1st Dist.] 1983, writ ref’d n.r.e.). Fillion relies in this connection only on Russell v. Truitt, supra, and Nolan v. Bettb, supra, but does not recognize that those cases involved an actual monetary judgment (in addition to the exemplary damages); nor does Fillion address City Products Corp. v. Berman, supra, or any of the cases cited in note 26, supra. Moreover, it appears that in Fillion the defendant received and held for a time the actual possession of the plaintiff’s tangible property, so that plaintiff was in fact unlawfully deprived thereof to her actual injury and damage. To the extent Fillion is not explainable on that basis, it appears not to represent the rule in Texas.

. Equico also claims that its secured debt from Dairyland was greater than the $273,361.16 allowed it by the trial court. We reject this contention, as the trial court's factual determination in this regard is supported by sufficient evidence and is not clearly erroneous. We likewise reject Equico's claim that the trial court should have used a date later than May 19, 1975 to calculate its debt for setoff purposes. This was a reasonable date for the purpose since the trial court could properly find it was shortly after the last of the challenged transfers. However, as our holdings reduce the amount of the Trustee’s substantive claims against Equico below the amount of the secured debt owed it by Dairyland, there remains no basis for the allow-anee of the $27,032.90 prejudgment interest against Equico, and we set that portion of the judgment aside. However, Equico's May 19, 1975 debt figure should exclude not only the $150,193 but also any interest thereon. We observe that the case has been tried, and briefed and argued on appeal, by all parties on the assumption that the set-off procedure is appropriate (though Equico complains of the details of its implementation) in respect to the substantive claims against Equico and the secured debt owed it.

. Appropriate interest adjustments will also be required as indicated in note 28, supra.

. We reject Equico’s remaining claims of error respecting the Trustee’s suit against it. The submission of interrogatory 7, inquiring if Equico exercised "the ordinary degree of care,” whether or not proper, was in any event not prejudicial to Equico. No part of the judgment was based on this finding. Equico’s claim that it did not receive a fair trial is refuted by the record, and we reject it.

. We note that the trial court’s judgment in effect gave Newton and Mesker the benefit (respecting the Trustee’s substantive claims) of the setoff allowed Equico for the secured debt owed it by Dairyland; this was doubtless done because the trial court held Newton, Mesker, and Equico all jointly and severally liable for the full amount of the same claims of the Trustee and in order to prevent a double recovery on the part of the Trustee (by both receiving a credit on the secured debt to Equico and a separate judgment against Newton and Mesker). As to the substantive claims of the Trustee for which we have held Newton and Mesker are liable and Equico is not (L&, all such claims except that for the $150,193), however, there appears no reason to make this provision allowing Newton and Mesker an offset for the secured debt owed Equico.
Newton and Mesker do not challenge the judgment in favor of Brazos and against them.

. Carruth v. First National Bank of Fort Worth, 544 S.W.2d 678 (Tex.Civ.App.—Eastland 1976, writ ref’d n.r.e.), relied on by Brazos, does not sustain its position, for in that case there was an actual foreclosure and sale, so the plaintiff landowner lost possession (and title) of his land. Exemplary damages were not involved, and actual damages were sought on the basis of the value of the land.

. The printed note form used (a form of the local bar association) is not designed for an "add on interest" note. The form is interlined so that no interest (other than the "add on”) is charged prior to maturity on the $296,600 face amount and so as to state that such sum ($296,-600) "includes interest at the rate of twelve per centum (12%) per annum.” The note states that it is secured by the two deeds of trust of even date on the ranch (one on the 49 acres, the other on the 767 acres). The deeds of trust are likewise on printed local bar association forms. The typed description of the note, appearing in each deed of trust, refers to the note as being for "$296,600, which sum includes interest at the rate of twelve (12%) per cent per annum,” and states with respect to the monthly payments (each $3,531 except the final installment of $3,527) "such installments including principal and interest."

. Tex.Rev.Civ.Stat.Ann. art. 5069-1.06(1) (Vernon 1971), as in effect at the relevant times, provided penalties for "[a]ny person who contracts for, charges or receives interest which is greater than the amount authorized by” law "provided that there shall be no penalty for a violation which results from an accidental and bona fide error.” (Emphasis added.)

. The present case is also far removed from the facts considered by the Texas Supreme Court in Smart v. Tower Land and Investment Co., 597 S.W.2d 333 (Tex.1980). In that case, the Texas Supreme Court considered a promissory note that expressly provided that "the payees or other holders of this note shall never be obligated to refund any payment of interest or principal after such payment has been made." The court found that "[i]n the absence of a savings clause [the] expressed authorization to retain excess unearned interest overcomes the presumption of legality accorded to allegedly usurious contracts.” Id. at 341 (footnote omitted).

. We recognize that the printed savings clause in each deed of trust speaks of limiting the interest to ten percent, while the note states its interest is calculated at twelve percent and this is also reflected in the description of the note contained in each deed of trust. We do not think this requires us to disregard the printed savings clause in preference to the printed acceleration clause in the same instrument. The ten percent printed figure was obviously included simply as part of a form prepared by the local bar association (as appears from the face of the instruments) for general individual use at a time when the maximum legal rate for individuals was, as it had long been, ten percent. See Tex.Rev.Civ.Stat.Ann. art. 5069-1.02 (Vernon 1971). Virtually all lawyers in Texas know the purpose of such a clause. Paraphrasing Walker v. Temple Trust Co., supra, we can say that it is "obvious” that the appearance of the printed figure “10%” in the savings clause "was due to the use of a printed form, without an intention that the literal ... [figure in] the form was to” destroy the plain intent of the savings clause to prevent a usurious application of the deed of trust and its acceleration clause. Id. 80 S.W.2d at 939. The savings clause can fairly be construed as representing the intent of the parties to limit the interest to the then allowable maximum rate.