Paul S. MEISLER, Plaintiff-Appellee,

v.

Jacqueline A. SMITH and Clarence E. Smith, Defendants-Appellants.

No. 86–1232.

United States Court of Appeals, Fifth Circuit.

April 21, 1987.

Petition for Rehearing Withdrawn June 15, 1987.

Eric W. Buether, Dallas, Tex., for defendants-appellants.

Gaye Rothman, Richard McCarroll, Austin, Tex., for plaintiff-appellee.

Before GARWOOD, JOLLY and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

This diversity appeal presents the question of whether, under Texas law, Paul S. Meisler, a real estate broker, is entitled to receive a real estate commission from Jacqueline A. and Clarence E. Smith (the Smiths) even though the property they engaged Meisler to sell was never sold. The district court concluded after a jury trial that Meisler had procured ready, willing and able purchasers for the property and therefore was entitled to receive his commission. We hold that the "free look" provisions in each of the contracts between the Smiths and the prospective purchasers, combined with the lack of evidence that the prospective purchasers had indicated a willingness to close, requires a finding that the prospective purchasers were not ready, willing and able to purchase the property. Accordingly, we reverse.

## I.

The Smiths are owners of an apartment complex located in Austin, Texas, known as The Landings Apartments (the apartment complex or property). On October 12, 1983, the Smiths entered into an exclusive listing agreement (the listing agreement) with Meisler. Pursuant to the listing agreement the Smiths employed Meisler for a period of 120 days as the sole and exclusive agent to sell the property. The listing agreement provided that Meisler was authorized to offer the property to the public "at a price of $8,500,000.00 or any other price and on such terms that the Owner [the Smiths] may accept."

Paragraph 3 of the listing agreement set forth terms governing Meisler's right to a commission. That paragraph provided, in part, as follows:

Owner agrees to pay Broker a commission equal to 5 percent of the gross sales price of the property (1) if the Broker shall, during the term of this agreement, produce a purchaser ready, willing and able to buy said property at the price and terms above listed, or at any other price and terms the Owner has agreed to accept, or (2) if, during the term of this agreement, the property is sold or exchanged by Broker, Owner, or any other person at the price and terms listed, or at any other price and terms Owner has agreed to accept. The time for the payment of such commission shall be at closing of any contract entered into pursuant to this agreement.

Shortly after the parties executed the listing agreement, Meisler suggested to the Smiths that they offer some form of seller financing in order to enhance the marketability of the property. Meisler sent the Smiths a proposed addendum to the listing agreement setting forth certain terms pursuant to which the Smiths would agree to finance the sale of the property. On October 21, 1983, the Smiths executed the addendum.

In January and early February 1984 Meisler or his agent Robert Wagner submitted to the Smiths offers to purchase the apartment complex on behalf of five separate prospective purchasers.[1] Each of these offers was made in the form of a lengthy, detailed proposed earnest money contract.[2] Except for the Mauro contract, none of the proposed contracts offered to purchase the apartment complex for cash. Christie's second proposed contract offered $8.9 million and the other proposed contracts offered $8.5 million to be financed over a period of eight years. The proposed contracts also contained numerous additional terms and conditions which were not addressed in the listing agreement. In particular, each of the five proposed contracts submitted by Meisler on behalf of the pro-

---

**1.** The prospective purchasers on whose behalf Meisler submitted contracts were the Barnes-Connally Partnership, Barry M. Lewis, Joe Christie, George Smith, and Don B. Mauro.

**2.** Barnes-Connally submitted its proposed contract on January 4, 1984. Lewis submitted his proposed contract on January 6. Christie submitted two proposed contracts—the first con-

tract is undated and the second was submitted on January 12. George Smith submitted his initial proposed contract on January 16. Mauro submitted his proposed contract on January 31. The Smiths did not accept any of these proposed contracts after they were submitted to them by Meisler.

spective purchasers contained a "free look" provision.[3] The "free look" provision entitled each of the prospective purchasers to terminate the proposed contract for a period of time without any liability in the event that the prospective purchaser determined, at his own discretion, that he was not satisfied with the property.

On January 30, 1984, the Smiths sent Meisler a list setting forth 23 terms and conditions that they wanted to be included in any contract to sell the property. On February 1 Wagner sent a copy of the 23 point list to each of the five prospective purchasers. Barnes-Connally never responded to the 23 point list. On February 15 Lewis' attorneys sent a letter to Meisler stating that they would accept some of the terms in the 23 point list but would not accept others and set forth various counterproposals. Meisler forwarded the letter to the Smiths, but no agreement between Lewis and the Smiths was ever reached regarding the terms and conditions for the sale of the property. On March 6 Wagner sent the Smiths a letter from Christie responding to the 23 point list. Christie also agreed to some of the terms and rejected other terms proposed in the 23 point list. As with Lewis, no agreement for the sale of the property was ever reached between Christie and the Smiths. The Smiths also rejected the proposed contract submitted by Mauro, mainly because the offer to purchase was made contingent upon a rezoning of the property. Mauro rejected a counteroffer made by the Smiths. Thus,

four of the five prospective purchasers procured by Meisler never agreed to come to terms with the Smiths and ceased all negotiations with the Smiths for the purchase of the property.

The course of events involving George Smith were slightly different. The listing agreement between Meisler and the Smiths expired on February 9, 1984, and was not renewed or extended. As of that date the Smiths had rejected the proposed contract submitted by Meisler on behalf of George Smith and had not received a reply from him to their proposal set forth in the 23 point list. On February 14 Richard Kleberg (one of the principals on whose behalf George Smith had submitted his offer) responded to the 23 point list by informing Meisler that he decided to submit a cash offer "in an attempt to simplify the transaction." Thereafter, George Smith, on Kleberg's behalf, offered the Smiths a cash price of $7.5 million for the property. Later, on Kleberg's behalf, George Smith offered to pay $8.9 million for the property. On March 21 George Smith and the Smiths entered into an earnest money contract for the sale of the property for a cash price of $8.9 million (the George Smith contract).

The George Smith contract, like all the other proposed contracts, contained a "free look" provision allowing the prospective purchaser to terminate unilaterally the contract without any liability. Originally the contract provided that George Smith could terminate the contract for any reason until 5:00 p.m. on May 15, 1984. The contract

---

**3.** The "free look" provisions in the proposed contracts were worded in various ways. The proposed contract sent to the Smiths by Lewis, for example, stated in article 4.2:

*Feasibility Study.* Purchaser will have until the later of (i) sixty (60) days after the Effective Date of this contract, or (ii) thirty (30) days after the date Purchaser receives the Title Commitment and the Survey (hereinafter called the "Feasibility Study Period") to make all physical inspections of the Property which Purchaser may desire to make or have made and to satisfy himself (in his sole discretion) as to all aspects of the Property including, without limitation, the suitability of the Land for alternative future use and development, the availability of financing for such development, the adequacy of utility service to the Land and the like. In the event that the

result of any such inspections made or caused to be made by Purchaser, or any other aspects of the Property are, for any reason, in Purchaser's sole discretion, unsatisfactory to Purchaser, Purchaser may terminate this Contract by giving written notice thereof to Seller prior to the expiration of the Feasibility Study Period. Upon the giving of such notice by Purchaser, this Contract will automatically terminate, $100.00 out of the Earnest Money will be delivered to Seller as an option fee for the Feasibility Study Period, the balance of the Earnest Money will be immediately refunded to Purchaser, and thereafter the parties will have no further rights or duties to each other under this Contract. If such termination notice has not been given prior to the expiration of the Inspection period, this Contract will continue in full force and effect.

was then amended on May 11; this amendment extended until 5:00 p.m. on May 18 the date by which George Smith could terminate the contract pursuant to the "free look" provision. Meisler and Wagner continued their involvement in the transaction throughout this period of time.

George Smith elected to terminate the contract on May 17, 1984, by sending a letter to the attorney handling the transaction on behalf of the Smiths stating that he was exercising his right to terminate the contract pursuant to the "free look" provision; the letter set forth no reason for his exercise of the termination provision. George Smith's earnest money deposit was returned to him; the apartment complex subsequently has not been sold to anyone else.

Meisler brought an action in state district court alleging that he was entitled to a commission from the Smiths pursuant to the listing agreement entered into between him and the Smiths in October 1983. The Smiths removed the action to federal district court.

Meisler's suit was based upon his contention that, during the term of the listing agreement, he produced five separate prospective purchasers who were ready, willing and able to purchase the property pursuant to the terms and conditions of the listing agreement. The Smiths denied the substance of Meisler's allegations, essentially claiming that Meisler was not entitled to a commission because he failed to produce purchasers who were ready, willing and able to purchase the property on terms acceptable to the Smiths. The Smiths also asserted various defenses to Meisler's claim as well as a counterclaim under the Texas Declaratory Judgment Act. In their counterclaim, the Smiths sought a declaratory judgment that they were not liable to Meisler for any commission as well as attorney's fees.[4]

The case was subsequently tried to a jury. The district court submitted a special interrogatory asking the jury, with respect to each of the five prospective purchasers, whether Meisler or his agent produced a buyer who was ready, willing and able to purchase the apartment complex at the same or better terms than those described in the listing agreement. The jury answered yes with respect to four of the five prospective purchasers.[5] Based upon this verdict, the district court entered a judgment in favor of Meisler against the Smiths for his commission in the amount of $445,-000 plus interest and attorney's fees. The Smiths filed a motion for a new trial which the court denied. The Smiths subsequently filed this appeal.

## II.

We first address the question of whether Meisler's commission was contingent on the sale of the property. If it was contingent on the sale of the property, Meisler would not be entitled to a commission since it is undisputed that no sale of the property has been consummated.

■ We have observed that in the absence of specific contractual language to the contrary, "Texas law provides that a broker who has procured a buyer who has entered into an enforceable contract of sale with the seller has earned his commission, even if the transaction later fails to close." *Hoyt R. Matise Co. v. Zurn*, 754 F.2d 560, 566 (5th Cir.1985); *see also Thornton v. Bean Contracting Co.*, 592 F.2d 1287, 1289, *modified on petition for reh'g*, 597 F.2d 62 (5th Cir.1979) (applying Texas law and stating that "[i]n the absence of contractual terms providing otherwise, a broker earns his commission by procuring from the purchaser a valid, enforceable contract of sale" even if the parties do not complete the sale). The listing agreement between Meisler and the Smiths contains no language to except it from this general

4. The Smiths also filed a motion for summary judgment contending that Meisler was not entitled to a commission, as a matter of law, with respect to any of the five prospective purchasers procured by Meisler. The district court denied the motion.

5. The jury found Barnes-Connally, Lewis, Christie, and George Smith to be ready, willing and able purchasers. They found that Mauro was not a ready, willing and able purchaser.

rule. Indeed, it states that Meisler is entitled to his commission when he produces a purchaser ready, willing and able to buy the property. Meisler's right to receive a commission on *sale* of the property is stated in the alternative.

The Smiths argue that the district court erred in refusing to submit an interrogatory to the jury asking the jury whether the parties intended to condition Meisler's commission upon the sale of the apartment complex. The Smiths also contend that Meisler cannot receive a commission because all of the proposed contracts conditioned Meisler's receipt of a commission on closing the sale.

We find the Smiths' arguments unpersuasive. Parol evidence is not admissible to vary the written terms of an unambiguous contract. *See, e.g., Don Drum Real Estate Co. v. Hudson,* 465 S.W.2d 409, 412 (Tex.Civ.App.—Dallas 1971, no writ). The Smiths assert that the language in the listing agreement providing that Meisler's commission would be payable "at closing" conditions his commission on the consummation of a sale. As the Smiths concede, however, this provision merely indicates when the commission would be paid, not when the broker has earned his commission. *See Ramesh v. Johnson,* 681 S.W.2d 256, 259 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (a contractual provision making a commission payable "at closing" merely fixes a time for payment and does not make the payment contingent on consummation of the sale). *See also McPherson v. Osborn,* 475 S.W.2d 804, 807 (Tex.Civ.App.—Amarillo 1971, no writ). Instead, the language in the listing agreement clearly indicates that Meisler was entitled to his commission when he found a ready, willing and able purchaser.

We are also unpersuaded by the Smiths' contention that Meisler cannot receive a commission because the proposed contracts allegedly condition his receipt of the commission on the closing of the sale of the property. First, we agree with Meisler

that his right to a commission is governed by the listing agreement between him and the Smiths and not by the proposed contracts between the Smiths and the prospective purchasers. Second, no earnest money contract was ever completed between the Smiths and any purchaser. Meisler's right to a commission cannot be subverted by the terms of proposed contracts which the Smiths rejected or the George Smith contract which was not completed. Accordingly, we hold that the district court properly refused to submit the Smiths' proposed interrogatory to the jury.

### III.

We now turn to the issue of whether Meisler procured a purchaser during the time span of the listing agreement who was ready, willing and able to buy the property.

### A.

The applicable legal principles are straightforward. A broker earns his commission by producing a purchaser "ready, able and willing to buy the property upon the contract terms." *Goodwin v. Gunter,* 109 Tex. 56, 185 S.W. 295, 296 (1916), *set aside on other grounds,* 109 Tex. 56, 195 S.W. 848 (1917).[6] *See also Air Conditioning, Inc. v. Harrison-Wilson-Pearson,* 151 Tex. 635, 253 S.W.2d 422, 425 (1952) (describing *Goodwin* as the "leading authority" on this question); *Fuess v. Mueller,* 630 S.W.2d 715, 717 (Tex.App.—Houston [1st Dist.] 1982, no writ). The ultimate issue in cases where no sale has occurred is whether the prospective purchaser was ready, willing and able to purchase on the terms set out in the agreement between the seller and the broker. *Stolaroff v. Campbell,* 18 S.W.2d 838, 840–41 (Tex.Civ.App.—El Paso 1929, no writ).

The jury found that four of the five prospective purchasers were ready, willing and able. The Smiths assert two reasons why this finding is erroneous. First, they

---

**6.** The contract referred to is the contract between the seller and the broker. 185 S.W. at 296.

contend that the "free look" provisions in each of the contracts demonstrate as a matter of law that the purchasers were not ready, willing and able to buy. Second, the Smiths assert that even if the prospective purchasers were ready, willing and able to buy, they did not agree to do so on terms acceptable to the Smiths. We turn first to an examination of the "free look" provision in each contract.

### B.

The debate over the effect of the "free look" provision on Meisler's ability to recover a commission centers on several old Texas cases. The Smiths rely on *Moss & Raley v. Wren,* 102 Tex. 567, 120 S.W. 847 (1909) (opinion on motion for rehearing). *Moss* held that a purchaser who agrees to a contract to purchase property that allows him a certain time in which to refuse to take the property is not a ready, willing and able buyer. *Id.*[7] Several cases have followed *Moss. See, e.g., Simpson v. Eardley,* 137 S.W. 378 (Tex.Civ.App.—San Antonio 1911, writ ref'd); *Crum v. Slade & Bassett,* 154 S.W. 351 (Tex.Civ.App.— Amarillo 1912, no writ) (*Crum I*). Both *Simpson* and *Crum* held that a party who reserves an option not to go through with the transaction is not ready, willing and able. Under *Moss* Meisler would not be able to collect his commission because the "free look" provisions in the proposed contracts allowed the purchasers to back out from the deal.

Meisler counters with *Hamburger & Dreyling v. Thomas,* 103 Tex. 280, 126 S.W. 561 (1910). In *Hamburger* the court held that a broker's right to his commission is not defeated even if the purchaser has entered an option contract to the extent that the sale falls through because of the seller's failure to produce good title. 126 S.W. at 561–62. *Hamburger* has also been followed by several Texas cases. *See, e.g.,*

*Cockrell v. Maxcey,* 202 S.W.2d 293 (Tex. Civ.App.—Austin 1947, writ ref'd n.r.e.); *Tate v. Morris, Graham & Morris,* 248 S.W. 797 (Tex.Civ.App.—Fort Worth 1922, no writ); *Slade & Bassett v. Crum,* 193 S.W. 723 (Tex.Civ.App.—Amarillo 1917, no writ) (*Crum II*). Meisler claims that under *Hamburger* he is entitled to his commission because it was the Smiths' insistence on new terms in the purchase contracts, rather than the purchasers' right to exercise the "free look" provision in each contract, that terminated the deal.

We believe that the Smiths have the better argument in the instant case. After analyzing the cases cited by both parties, we hold that, under Texas law, a contract giving the purchaser an option to withdraw creates an inference that he is not ready, willing and able to purchase and, if unrebutted by substantial proof to the contrary, justifies denying the broker his commission. In *Tate,* for example, the purchaser signed an unenforceable contract. The court stated that if the brokers relied on this contract alone, they could not recover their commission. 248 S.W. at 800. However, the purchaser had testified unequivocally that he was ready, willing and able and that the deal fell through because of title problems. The court noted that

> the evidence undoubtedly is sufficient to show that the reason [the purchaser] failed to complete the purchase was not because of any privilege or option that he might have under the contract ... but because appellant's title was defective. Under such circumstances, it was immaterial that the contract was optional.

248 S.W. at 800. Accordingly, the court held that the broker was entitled to his commission.

In *Henderson & Grant v. Gilbert,* 171 S.W. 304 (Tex.Civ.App.1914), another case relied on by Meisler, the court discussed in dicta whether the unenforceability of a con-

---

7. In its first opinion in *Moss,* the Texas Supreme Court held that the broker was entitled to his commission. *Moss & Raley v. Wren,* 102 Tex. 567, 113 S.W. 739 (1908). The court originally misunderstood the purchaser's contract and thought that the seller could specifically enforce it. However, a contract is not enforceable until

neither party has the right to terminate it. *Thornton v. Bean Contracting Co.,* 592 F.2d 1287, 1290 (5th Cir.1979). After the court reevaluated the limits of the seller's rights, it held that the broker could not recover his commission.

tract would deprive the broker of his commission; the court concluded that if the buyer remained ready, willing and able, the broker would be entitled to his commission. In awarding the broker his commission the court relied on testimony that the buyer was ready to purchase. 171 S.W. at 306. Likewise, the court in *Cockrell*, which assumed arguendo that the contract was a "mere option," referred to "abundant" proof that the purchasers were willing to buy. 202 S.W.2d at 295–96. Quoting *Hamburger*, the court held that the broker was entitled to his commission. *Id.* In *Hamburger* itself, the court stated that the broker's entitlement to his commission "[was] not wholly dependent upon the writing executed between the owners of the property and the proposed purchaser." 126 S.W. at 561. This implies that some other evidence might outweigh the inference of tentativeness drawn from the fact that the purchaser has the right to withdraw. In *Hamburger* the course of conduct between the parties strongly suggested that the buyer had no intention of exercising his right not to purchase.

Both *Crum I* and *Crum II* support the view that the "free look" provision, in the absence of substantial evidence to the contrary, indicates that a purchaser is not ready, willing and able to purchase. Under the contract in question in *Crum I* and *Crum II* the buyer could back out of the purchase by forfeiting $2,000. In *Crum I* the jury awarded the broker his commission but the appeals court reversed because the contract did not bind the purchaser to buy the property. However, because the trial court had erroneously excluded the purchaser's testimony, the case was remanded. At the second trial, the judge directed a verdict for the sellers, but the appeals court reversed, stating: "The testimony in the record is sufficient to support the finding that [the buyer] was at all times ready, willing, and able to ... consummate the deal in accordance with the contract...." *Crum II*, 193 S.W. at 725. *Cf. Del Anderson & Assoc. v. Jones*, 531 S.W.2d 417, 421 (Tex.Civ.App.—Eastland 1975) (contract unenforceable; affidavit by purchaser that he was nonetheless ready, willing and able countered by affidavit by his attorney to the contrary; dispute was a fact question for jury), *rev'd on other grounds*, 539 S.W.2d 348 (Tex.1976). Unfortunately, *Crum II* does not state the source of this testimony; however, in *Simpson* the broker's testimony of the purchaser's readiness was not sufficient to overcome the inference, drawn from the optional nature of the contract, that the buyer was not ready, willing and able to purchase.[8]

Consequently, in order to be upheld, the jury's finding that four of the prospective purchasers were ready, willing and able must be supported by sufficient evidence to overcome the inference, created by the "free look" provisions, that the prospective

---

**8.** Other cases cited in the text of Meisler's brief are not inconsistent with this view. In *Rogers v. McMillen*, 62 Tex.Civ.App. 486, 132 S.W. 853 (1910, no writ), the land was sold but the court denied the broker his commission because he argued for recovery based on his alleged procurement of a buyer willing to pay $22 an acre. The evidence showed, however, that the buyer had conditioned his acceptance on his wife's approval and had ultimately purchased the property at $20 an acre through another broker. Thus the broker in *Rogers* never procured a ready, willing and able buyer. In *Lockhart-Hutchens v. Bergstrom*, 434 S.W.2d 453 (Tex.Civ. App.—Austin 1968, writ ref'd n.r.e.), the court held that the purchasers were not ready, willing and able because the consummation of the contract was conditioned on their receipt of a loan, which they never procured. In *Ramsey v. West Texas Bank & Trust Co.*, 155 S.W. 551 (Tex.Civ. App.—San Antonio 1913, writ ref'd), the broker successfully based his right to a commission on the completed sale of the property. The sale irrefutably demonstrated that the purchasers were ready, willing and able. Furthermore, there is dictum in *Ramsey* suggesting that a broker may never recover his commission in an optional contract until the sale is consummated. *Id.* at 552.

In neither *Rogers* nor *Lockhart-Hutchens* was there any evidence presented, outside of the broker's testimony, to suggest that the purchaser was ready, willing and able. Indeed, all the evidence in those cases pointed away from that conclusion. The buyer in *Ramsey* was ready, willing and able (after all, a sale occurred), so the court's discussion of the effect of an option contract when a sale does not occur is not necessary to the disposition of the case.

purchasers were not ready, willing and able to purchase.

■ We find insufficient evidence in the record to support the jury's finding that Barnes-Connally, Lewis, and Christie were ready, willing and able purchasers. Our examination of the record reveals no evidence to overcome the inference created by the "free look" provision. The contracts from these prospective purchasers that were sent to the Smiths were quite detailed and touched on many matters not alluded to in the listing agreement between Meisler and the Smiths. These contracts were not acceptances of the Smiths' offer to sell but instead were themselves offers which the Smiths could accept or reject. None of these three prospective purchasers accepted the counteroffer containing the 23 point list of conditions presented to them by the Smiths. In addition, none of the prospective purchasers were able to reach agreement with the Smiths on all of the terms of the sale or indicated a willingness to close but for a problem with the title for the property. Thus, there is no evidence to support the jury's conclusion that Barnes-Connally, Lewis, and Christie were ready, willing and able purchasers. This is not a case where bad faith on the part of the seller prevented the sale from being consummated; rather, it is a case where the parties were unable to reach agreement on the terms of the sale. Since there is not substantial evidence to support the jury's finding, its conclusion with respect to Barnes-Connally, Lewis, and Christie being ready, willing and able purchasers must be set aside. *See Mack v. Newton,* 737 F.2d 1343, 1350 (5th Cir.1984) (jury verdict will not be set aside if there is substantial evidence to support it).

■ With regard to George Smith, however, Meisler claims that he is also entitled to a commission because George Smith was prevented from purchasing the apartment complex because of defects in the title.[9] A broker is entitled to collect his commission where a sale is not completed due to a title problem and the purchaser is otherwise ready, willing and able. *Peters v. Coleman,* 263 S.W.2d 639, 643 (Tex.Civ.App.— Fort Worth 1953, writ ref'd n.r.e.) We conclude that the evidence in the record does not support Meisler's contention that George Smith's decision not to purchase the property was based on alleged title problems.

■ First, there is no evidence that George Smith advised the Smiths that he had any questions about the Smiths' title, as required by paragraph four[10] of his contract with the Smiths. Further, when George Smith terminated the contract, he did so pursuant to paragraph nine[11] of the contract, which contained the "free look" provision, rather than paragraph four.[12]

---

9. The Smiths contend that this issue is being raised for the first time on appeal. We disagree. The reasons why George Smith terminated his agreement are relevant in determining whether he was a ready, willing and able purchaser, which is the primary issue in this case.

10. Paragraph four of the proposed contract between George Smith and the Smiths states in part:

   *Objections to Survey and Title.* On or before 5:00 p.m. on April 30, 1984, Buyer shall advise Seller of any exception to title reflected ... which Buyer finds unacceptable, specifying, in detail, the objection(s).

   \* \* \* \* \* \*

11. Paragraph nine of the proposed agreement between George Smith and the Smiths, which contains the "free look" provision, states:

   *Buyer's Conditions.* It shall be a condition to any obligation of Buyer hereunder that Buyer shall be satisfied with the Property in all respects, in Buyer's sole discretion, by 5:00 p.m. on May 15, 1984, and if not so satisfied, Buyer may give written notice to Seller of cancellation of this Contract by 5:00 p.m. on May 15, 1984 in which case Buyer shall be entitled to receive back the earnest money and neither party shall have any further obligation under this Contract, but failing to give such timely written notice of cancellation, the Buyer shall be bound by this Contract.

   By agreement of the parties, George Smith was subsequently given until May 18 to exercise his rights under the "free look" provision.

12. George Smith also sought an extension of the "free look" period under paragraph nine rather than an extension of time to review and consider any objections to title under paragraph four. Although he had until May 28, 1984, to cancel the contract because of any title problems, instead he terminated the contract pursuant to the "free look" provision on May 17, 1984; the "free look" period expired on the next day.

Finally, the district court gave an instruction to the jury, at Meisler's request, instructing them to resolve the question of whether George Smith was a ready, willing and able purchaser without regard to whether there was a title defect. Thus, whether there was a title defect was taken away from the jury's consideration, and the jury verdict cannot be construed as supporting such a conclusion.

In light of the district court's instruction to the jury not to consider any defect in title in determining whether George Smith was ready, willing and able, the testimony that Meisler points to in order to show that George Smith did not close the contract for the apartment complex because title problems existed with the property is irrelevant. The jury could not have determined that George Smith was a ready, willing and able purchaser on a ground that the district court excluded from their consideration. Because of the instruction to the jury as well as George Smith's letter explicitly terminating the contract on the basis of the "free look" provision, we conclude that there is not substantial evidence to support the jury's finding that George Smith was ready, willing and able to buy the apartment complex. Accordingly, this finding must also be set aside. *See Mack*, 737 F.2d at 1350.

### IV.

Since all of the contracts contained the "free look" provision, and there is not substantial evidence to rebut the inference created by the provision, the district court erred in entering judgment in favor of Meisler.[13] Meisler did not procure a ready, willing and able purchaser for the Smiths' property. Accordingly, the judgment of the district court is REVERSED and the case is REMANDED for the entry of judg-

ment dismissing Meisler's action on the merits and for further proceedings on the Smiths' counterclaim.

REVERSED and REMANDED.

---

13. In light of our conclusions, we do not address the Smiths' arguments that Meisler failed to produce a buyer on the terms listed in his listing agreement with the Smiths, or that Meisler's alleged failure to comply with section 20(c) of the Texas Real Estate License Act also prevents him from collecting a commission.

The Smiths also ask us to enter a judgment in their favor for the amount of their attorney's fees incurred through trial and on appeal. The Smiths base their request on the counterclaim they asserted against Meisler in the district court under the Texas Declaratory Judgment Act. We believe the Smiths' request for attorneys' fees should first be addressed by the district court on remand.